Docket No. 108888.

IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS

MARIANNA KRYWIN, Appellant, v. THE CHICAGO TRANSIT
AUTHORITY, Appellee.

*Opinion filed July 15, 2010.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Thomas, Karmeier, and Burke concurred in the judgment and opinion.

Justice Freeman dissented, with opinion, joined by Justice Kilbride.

Justice Freeman also dissented, with opinion, upon denial of rehearing, joined by Justice Kilbride.

**OPINION**

In June 2005, plaintiff, Marianna Krywin, filed a two-count complaint in the circuit court of Cook County against defendant, Chicago Transit Authority (CTA), stemming from an injury she suffered while alighting from one of the CTA's trains onto the southbound platform at Sheridan Road in Chicago. A jury rendered a verdict in plaintiff's favor. The appellate court reversed. 391 Ill. App. 3d 663.

BACKGROUND

Count I of plaintiff's amended complaint alleged that on January 13, 2005, she was riding the CTA's red line train. The train stopped at an elevated train station. As plaintiff exited the train, she slipped on snow and water on the platform and fell, injuring her left leg. Plaintiff alleged that the CTA had a duty to exercise ordinary care in the operation, supervision, and maintenance of the area of ingress and egress where plaintiff fell and that the CTA negligently failed in its duty. In count II, plaintiff alleged that the CTA had a duty to exercise the highest degree of care in the operation of its trains and in the maintenance of the train stations and alleged that the CTA was guilty of willful and wanton conduct in failing to fulfill that duty.

The cause proceeded to a jury trial in October 2007. Darren Hill, security customer assistance controller for the CTA, testified that he received a call from CTA personnel regarding plaintiff's injury. Hill prepared a report of the incident. The report states that plaintiff slipped and fell on the southbound Sheridan Road platform and that she was transported to the hospital by fire emergency personnel.

Anthony Morales, a rail maintenance worker for the CTA, testified that his duties include maintaining the train platforms. He removes any ice or snow from the platform and then spreads sand across the entire platform. In January 2005, the Sheridan Road station was one of the stations to which he was assigned. He did not recall the weather conditions on the date of the accident or whether he removed any snow or ice from the southbound platform that day. However, based upon his routine, he would have been to the Sheridan Road station that morning, unless there was a bad storm that would have delayed him in getting to the Sheridan Road station. There is a small canopy at that station, which covers less than half of the platform.

Daniel Ivankovich, the orthopedic surgeon who treated plaintiff's injury, testified by evidence deposition. When he first saw plaintiff in the emergency room, she told him that she had slipped and fallen on ice. Plaintiff had a swelling and deformity of her lower extremity and the left ankle. She had a fracture of the tibia and fibula bones in her left leg. She was in a great deal of pain when Dr. Ivankovich first saw her. In explaining how plaintiff fractured her leg, Dr. Ivankovich stated that the tibia and fibula bones distally create the ankle joint.

There is a very complex series of ligaments in that area. Plaintiff has a condition called osteopenia, which is thinning of the bones. The ligaments were much stronger than the bone and she ended up with a "pilon, a spiral fracture, which more than likely meant that she planted her foot, rotated and the bone gave. The force was sufficient that the ligaments didn't tear, but the actual bone fractured." Dr. Ivankovich performed surgery to repair the fracture. Plaintiff was hospitalized for nearly a month.

The discovery deposition of Ruben Bonner was read to the jury in his absence. Bonner testified that he is a rapid transit operator for the CTA and was operating the red line train on the date of the accident. After passengers got on and off the train at the Sheridan Road station, someone said a woman had fallen. He left the train and observed plaintiff on her hands and knees on the platform. He did not recall which car plaintiff had exited or whether there was a canopy over the area of the platform where she fell. There were eight cars on the train that day and plaintiff was closer to the rear of the train. Bonner did not recall whether it was snowing when he pulled the train into the station, but it had snowed previously and it was cold. The surface of the platform was wet and icy. He did not observe any snow on it or any sand or salt.

Patricia Majors was the next witness. At the time of the accident, she was a student at DePaul University. She rode the red line train frequently to get to work and school and was familiar with the Sheridan Road station. The southbound platform has a very small canopy on the north end of the platform. On the date of the accident, she was waiting at the southbound platform to get on the train. It was raining and very cold. The entire platform was icy. She observed plaintiff exit the train and, as soon as she stepped off the train, she fell to the ground. Majors and another person gave plaintiff their coats, as it was raining and plaintiff was lying on snow and ice. Majors waited with plaintiff until the paramedics arrived. Majors had ridden the train the two days before the accident. During that time, she was on the platform from 5 to 15 minutes at a time waiting for the train. The weather had been rainy and cold, and it was icy and slushy on those days. The sidewalks were filled with slush that was over the top of her shoes. The southbound platform where plaintiff fell was icy that day. There was no sand or salt on the platform and there was no room

to step around the ice. The ice was about one-tenth of an inch thick. Based on the thickness of the ice, it did not appear to Majors that any work had been done with respect to the icy conditions.

Plaintiff testified through an interpreter. She is 76 years old and came to Chicago from Poland. She formerly worked as a nurse. On the date of the accident, she exited the train, putting one foot down and then the other one and it was slippery and she "went backwards." Prior to that day, she had no trouble walking and did not use any walking aid. That morning, there was a little bit of snow falling and there was a lot of snow on the platform. When she exited the train, she made one step with her right foot into the snow and then she stepped with her left foot and "then I, you know, I went–I had fallen backwards and then I was screaming from pain." She was unable to get up and then, later, two men appeared with a stretcher.

The parties stipulated to the testimony of Theresa Williams, a customer service agent for the CTA. She was assigned to the Sheridan Road station on the date of the accident. She prepared two reports for the CTA as the result of plaintiff's accident. Williams did not recall the weather conditions on the day of the accident or the previous day. Nor did she recall the condition of the platform on those days. She would also testify that the CTA red line train ran 24 hours a day, 7 days a week in January 2005. Williams' reports were read to the jury. The reports identified "sleet" and "foggy" as the weather conditions on the day of the accident and "wet" as the condition of the area where plaintiff fell. Williams indicated that plaintiff was exiting the fifth car of the train when she slipped and fell. Williams responded to the customer assistance bell at 9:55 a.m. on the day of the accident. When Williams arrived at the platform, plaintiff was complaining of her leg hurting and possibly broken.

The trial court read an admission by the CTA to the jury, which was based upon the CTA's answer to a request to admit from plaintiff. Prior to reading the admission, the court admonished the jury that the admission was not to be considered evidence of negligence, but only as circumstantial evidence of what may or may not have happened on the date of the accident. The admission was that on and before the date of the accident, it was the CTA's policy to spread sand on the train platforms after removal of snow and ice.

At the close of plaintiff's evidence, the CTA presented a motion

-4-

for directed verdict. The motion alleged that, as a matter of law, the CTA had no duty to remove a natural accumulation of ice and snow and no duty to warn of such an accumulation. The CTA further argued that plaintiff had presented no evidence that there was any unnatural accumulation of ice or snow on the platform. The CTA argued that there was no evidence that it had maintained the platform in a negligent or reckless manner. Thus, according to the CTA, plaintiff failed to make a *prima facie* case of either negligence or willful and wanton conduct.

Plaintiff's attorney argued that the CTA had a duty to remove natural accumulations of ice from its platforms to provide a safe method of ingress and egress from its trains. Counsel argued that, regardless, there was evidence that there was some snow removal by the CTA and that it was done in a negligent manner. Counsel referred to the testimony from Majors that the sidewalks where Majors walked were filled with slush, but the train platform was a sheet of ice.

The trial court granted the motion for directed verdict in part, finding that the CTA did not have a duty to remove natural accumulations of snow or ice, nor did it have any duty to warn of such accumulations. The court also ruled that the ice on the platform resulted from a natural accumulation. The court found that the CTA did have a duty to provide a safe place for plaintiff to alight and that this duty existed regardless of the reason for the unsafe area. Thus, the court noted the only issue remaining, as to both counts of the complaint, was whether the CTA failed to provide plaintiff with a safe place to alight. In answer to a question from plaintiff's counsel as to whether he could still argue that the CTA negligently removed snow from the platform, the trial court stated that even if the snow were improperly removed, the ice beneath the snow was a natural accumulation and the CTA had no duty to remove the ice from the platform.

The sole defense witness was Diane Senechal, who testified that she was on the Sheridan Road platform at the time of plaintiff's accident. She saw that plaintiff had fallen, although she did not see her fall. It was snowing at the time. Senechal held her umbrella over plaintiff to shield her from the snow. It had been snowing or sleeting that morning. The surface of the platform was wet and slushy, but there was not much accumulation because most of the moisture

drained through the "slats" in the platform. The precipitation on the streets was much deeper due to the lack of drainage. She saw someone with a broom either at the other end of the southbound platform or on the northbound platform. The person was not sweeping, just standing there. Senechal did not notice any debris on the platform or any defects in it. She did not recall whether there was any sand on the platform.

The CTA renewed its motion for directed verdict following the close of all evidence, but the trial court denied it. In discussions with counsel, the trial court noted again that the issue of removal of the natural accumulation of ice or snow on the platform was not an issue in the case and plaintiff would not be allowed to argue that. The court stated, "I think what [plaintiff's counsel] is going to say is, you should have let the plaintiff off some place that was safe. Regardless of the reason, it was not safe. The evidence–the jury can believe Ms. Majors, whose testimony basically was, it was a sheet of ice. So that's a fact question for the jury to decide." Referring to the canopy, the court further noted, "Apparently, there was a location on the platform that was not covered with ice. I don't know that the–what the conductor could have done or could not have done."

The trial court instructed the jury. The court did not inform the jury that the CTA had no duty to remove any accumulation of ice on its platform. Rather, the court instructed the jury that in selecting a place for the plaintiff to alight from the train, it was the duty of the CTA to "exercise the highest degree of care consistent with the mode of conveyance used and practical operation of its business as a common carrier by train."

Following deliberations, the jury returned a general verdict in plaintiff's favor in the amount of $372,141. The trial court denied the CTA's posttrial motion.

The CTA appealed and the appellate court reversed. On appeal, the CTA argued that the trial court erred in not granting its motion for directed verdict in its entirety because plaintiff failed to prove that the CTA owed her any duty to remove the natural accumulation of ice and snow on the platform. The court noted the primary issue in the appeal was whether the CTA breached its duty to provide plaintiff with a safe place to alight from the train when it stopped the train in front of a natural accumulation of ice and snow. The court

acknowledged that, as a common carrier, the CTA owed to its passengers the highest degree of care consistent with the practical operation of its conveyances. A common carrier must furnish its passengers with a safe place to alight from the conveyance and an opportunity to reach a place of safety. The court also noted the rule that a property owner does not have a duty to remove natural accumulations of snow, ice, or water from its property. After reviewing the case law, the court determined that the natural accumulation rule prevails over the CTA's duty to provide its passengers with a safe place to alight. The appellate court rejected plaintiff's argument that the CTA could have allowed plaintiff to exit the train underneath the small canopy that covered part of the platform. The court found that the consequences of imposing a duty on the CTA to inspect every platform every time a train was to discharge or take on passengers would bring the transit system to a standstill. The court thus declined to impose such a duty. 391 Ill. App. 3d 663. This court granted plaintiff's petition for leave to appeal. 210 Ill. 2d R. 315. We also allowed the Northeast Illinois Regional Commuter Railroad Corporation (Metra), the Illinois Trial Lawyers Association, and the Illinois Association of Defense Counsel to file briefs *amicus curiae*.

ANALYSIS

Plaintiff makes three arguments in this appeal: (1) the natural accumulation rule should not prevail over a common carrier's duty to provide its passengers with a safe place to alight; (2) the appellate court erred in impermissibly expanding the natural accumulation rule to relieve the CTA of the duty to provide a safe place to alight, where the trial court ruled and the jury found that the CTA could have fulfilled its duty to provide a safe place to alight without engaging in ice removal; and (3) the appellate court erred in finding that the natural accumulation rule relieved the CTA of its duty to refrain from willful and wanton conduct.

I. Standard of Review

The appellate court found that the trial court erred in failing to grant the CTA's motion for directed verdict in its entirety. A motion

-7-

for directed verdict will not be granted unless all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). On review, all of the evidence must be construed in the light most favorable to the nonmoving party. *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 353-54 (1992). The standard of review of an order disposing of a motion for directed verdict is *de novo*. *Evans v. Shannon*, 201 Ill. 2d 424, 427 (2002).

To recover damages based upon negligence, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 256 (1999). The term "proximate cause" contains two elements: cause in fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the plaintiff's injury. *Young v. Bryco Arms*, 213 Ill. 2d 433, 446 (2004), quoting *Lee*, 152 Ill. 2d at 455. The relevant question is whether the defendant's conduct is a material element and a substantial factor in bringing about the injury. Conduct is a material element and a substantial factor if, absent the conduct, the injury would not have occurred. *Abrams v. City of Chicago*, 211 Ill. 2d 251, 258 (2004). Whether a duty exists is a question of law for the court to decide. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 227 (1996). The standard of review on questions of law is *de novo*. *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280 (2007). The touchstone of the duty analysis is to ask whether the plaintiff and defendant stood in such a relationship to one another that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff. The inquiry involves four factors: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 436-37 (2006). Questions regarding a breach of a duty and proximate cause of the injury are reserved for the trier of fact. *Jones v. Chicago & Northwestern Transportation Co.*, 206 Ill. App. 3d 136, 139 (1990).

## II. The Natural Accumulation Rule

This court has long held that a common carrier has a duty to its passengers to exercise the highest degree of care, not only to carry them safely to their destinations, but to provide them with a reasonable opportunity to leave the conveyance safely. See *Chicago Terminal Transfer R.R. Co. v. Schmelling*, 197 Ill. 619, 629 (1902); see also *Sheffer v. Springfield Airport Authority*, 261 Ill. App. 3d 151, 154 (1994) (due to the unique control a common carrier has over its passengers' safety, it owes those passengers the highest duty of care consistent with the practical operation of its conveyances). There is no dispute here that the CTA is a common carrier and that plaintiff was its passenger at the time of her injury. Thus, the CTA had a duty to provide plaintiff with a safe place to alight from its train.

Under the natural accumulation rule, a landowner or possessor of real property has no duty to remove natural accumulations of ice, snow, or water from its property. *Fillpot v. Midway Airlines, Inc.*, 261 Ill. App. 3d 237, 243 (1994). This rule has been applied to common carriers. In *McElligott v. Illinois Central R.R. Co.*, 37 Ill. 2d 459 (1967), the plaintiff's decedent was killed when the car in which he and the plaintiff were riding struck the defendant's train. The evidence showed that there had been snow and ice on the ground for at least a week prior to the accident and that the street on which the plaintiff was traveling was slippery and had not been treated with cinders or salt. The car slid when the plaintiff applied the brakes and it collided with the train. The defendant's right-of-way extended 50 feet on either side of its tracks. The plaintiff's principal contention at trial was that the defendant was under a duty to maintain the street within its entire right-of-way for the safety of motorists and that the defendant's failure to place cinders or salt on the right-of-way that extended into the street made it unsafe and caused the plaintiff's accident. In support of her case, plaintiff cited an Illinois Commerce Commission rule and a statute that required railroads to construct and maintain their crossings and approaches in a safe condition. This court found that the duty was limited to the defendant's crossings and approaches, which extended only four feet from the outer rails of the crossing, as these were the only areas which the defendant had constructed. The evidence showed the plaintiff's car had slid on the street within the defendant's right-of-way. Noting that the

municipality did not have a duty to remove natural accumulations of ice and snow from its streets, this court held that the defendant had no greater duty than a municipality to remove or otherwise offset the effect of natural accumulations of snow and ice from that part of its right-of-way not consisting of its crossings and approaches. *McElligott*, 37 Ill. 2d at 469.

In *Sheffer*, 261 Ill. App. 3d 151, the plaintiff was a passenger on one of the defendant's planes. After the plane landed, the passengers disembarked and began walking across the tarmac to the airport terminal. The plaintiff slipped on a large patch of ice and fell, injuring herself. She sued the airport authority and the airline. A jury rendered a verdict in her favor. The appellate court reversed. Recognizing a common carrier's heightened duty of care, the court nonetheless held that the defendant had no duty to remove the natural accumulation of ice on which the plaintiff fell, nor any duty to warn of the existence of the ice. *Sheffer*, 261 Ill. App. 3d at 154.

The plaintiff in *Serritos v. Chicago Transit Authority*, 153 Ill. App. 3d 265 (1987), slipped and fell on the steps of one of the defendant's buses. The day of the accident was snowy and the steps of the bus were covered in slush. In her complaint, the plaintiff alleged that the defendant had negligently failed to remove ice and snow from the steps of the bus and had failed to warn her of the slippery conditions. The trial court granted summary judgment to the defendant, finding no duty to remove the slush from the steps. The appellate court affirmed. The court noted that, even with a common carrier's higher duty of care, it would be impractical to impose a duty on the defendant to keep the steps of its buses clear of slush and snow tracked in by its patrons. Imposing such a duty would bring the transportation system to a standstill. *Serritos*, 153 Ill. App. 3d at 271-72.

Likewise, in *Shoemaker v. Rush-Presbyterian-St. Luke's Medical Center*, 187 Ill. App. 3d 1040 (1989), the appellate court held that the defendant was not liable when the plaintiff stepped off an elevator and fell on the floor where rainwater had been tracked in by patrons. The court found that, despite the defendant's highest duty of care to provide the plaintiff with a safe place to alight from the elevator (a common carrier), the rainwater was a natural accumulation which the defendant had no duty to remove or warn against. *Shoemaker*, 187 Ill.

App. 3d at 1045.

In *Jones v. Chicago Transit Authority*, 206 Ill. App. 3d 736 (1990), the plaintiff slipped on the wet steps of the defendant's bus and fell. The defendant moved for summary judgment, arguing it had no duty to remove natural accumulations of rain water from the steps of its buses. The plaintiff responded by arguing that the defendant had a duty to purchase buses equipped with a drainage device which would allow water to flow onto the street. The trial court granted summary judgment to the defendant. The appellate court affirmed, noting that, while the likelihood of injury is great, even greater is the magnitude of the burden of guarding against it and the consequences of imposing that burden on the defendant. The court held it would be impractical to require the defendant to replace or retrofit all its buses with a drainage system. Such a requirement would not be consistent with the practical operation of the defendant's bus service. *Jones*, 206 Ill. App. 3d at 739.

Plaintiff argues that the natural accumulation rule should not be applied to the case at bar. She contends the rationale underlying the natural accumulation rule is that it would place an unfair burden on a municipality to remove ice or snow from its sidewalks presented by an ongoing foul weather storm throughout an entire city. She argues the evidence showed that there was no ongoing storm in Chicago the day of plaintiff's accident, but that the ice on the platform had been there continuously for three days and that nothing had been done to remedy the condition, although the CTA could have easily done so.

In *Graham v. City of Chicago*, 346 Ill. 638 (1931), this court stated that the reason for the natural accumulation rule is that it would be unreasonable to require a city to expend funds and perform the labor necessary to keep its walks reasonably free from ice and snow during the winter months. *Graham*, 346 Ill. at 643. We note that the general rule that property owners have no duty to remove natural accumulations of ice or snow from their property has been applied without regard to any ongoing precipitation (see *Sheffer*, 261 Ill. App. 3d at 152 (the weather was "bright and sunny" at the time the plaintiff fell on the ice)) or the length of time the natural accumulation has existed (*Frederick v. Professional Truck Driver Training School, Inc.*, 328 Ill. App. 3d 472, 478 (2002) (there is no exception to natural accumulation rule based on the passage of time)). However, even

-11-

were we to find that the absence of an ongoing storm had some effect on the CTA's duty, we would find that the evidence was conflicting in this regard. Patricia Majors testified that on the day of the accident, as well as during the two days prior thereto, the weather had been rainy and cold. She stated that the sidewalks were filled with slush. The platform where plaintiff fell was also covered with ice during the times Majors was on the platform during those two days. Theresa Williams, customer service agent for the CTA, identified the weather conditions on the day of the accident as sleet and foggy. Defense witness Diane Senechal testified that it had been sleeting on the morning of the accident. She held her umbrella over plaintiff after she fell to protect her from the falling snow. The evidence thus contradicts plaintiff's claim that there was no evidence of ongoing adverse weather.

Plaintiff cites *Wasserman v. City of Chicago*, 190 Ill. App. 3d 1064 (1989), as an example of what she terms a "much sounder way" to decide whether a common carrier should receive the benefit of the natural accumulation rule. In *Wasserman*, the plaintiff sued the City and the CTA. She was a passenger on one of the CTA's buses. Ice and snow covered the ground. At the place where the plaintiff got off the bus, the sidewalk was covered in ice and snow. Although the streets had been cleared of snow, there were deep piles of snow at the place where the bus stopped and there was no place to walk between them. The plaintiff fell as she took a step away from the bus. The trial court granted summary judgment to the CTA. On appeal, the plaintiff argued that the CTA breached its duty to ensure that the bus stopped at a place where it was safe for her to exit the bus. The appellate court noted that the CTA, as a common carrier, had a heightened duty of care to its passengers and that this duty continues until passengers have had a reasonable opportunity to reach a place of safety. The court observed that the CTA had failed to provide any evidence that it was impossible to stop further away from the snow piles or at some other point along the street. Thus, a question of fact existed as to whether the CTA had breached its duty to provide the plaintiff with a safe place to alight from the bus. *Wasserman*, 190 Ill. App. 3d at 1067.

We note that, although the CTA in *Wasserman* argued that the snow was a natural accumulation, the appellate court did not rest its

-12-

ruling on that ground. The issue there was solely whether the CTA had breached its duty to provide the plaintiff with a safe place to alight. The fact that the streets had been cleared and that there were deep piles of snow suggests, if anything, that the snow piles were an unnatural accumulation. In any event, it is obvious that a bus driver has a much better opportunity to determine the best place to let his or her passengers off the bus than does a train operator on an eight-car train whose only option is to discharge passengers on a platform. Based upon *Wasserman*, plaintiff argues that a jury is fully capable of deciding whether, under a specific set of facts, a common carrier should be held liable for failing to provide a safe place to alight or, given the conditions of the day, the common carrier fulfilled that duty. We do not disagree with plaintiff that, under appropriate circumstances, the question of whether a common carrier breached its duty to provide a safe place to alight is a question of fact for the jury to decide. In *Wasserman*, the appellate court determined that a question of fact existed and that summary judgment should not have been granted. Such is not the case here, however.

We conclude that the natural accumulation rule applies in this case and that the CTA had no duty to remove the natural accumulation of ice and snow from its platform, nor any duty to warn of the existence of such natural accumulation. As there was no evidence that the ice on the platform where plaintiff fell was anything other than a natural accumulation, we find that the trial court did not err in granting the CTA's motion for directed verdict on this basis.

In so holding, we recognize the dangers posed by natural accumulations of snow and ice. The absence of a duty to remove them "does not rest upon the notion that the conditions presented by such accumulations are safe. To the contrary, the hazards presented have always been acknowledged, but the imposition of an obligation to remedy those conditions would be so unreasonable and impractical as to negate the imposition of a legal duty to do so." *Trevino v. Flash Cab Co.*, 272 Ill. App. 3d 1022, 1029-30 (1995).


### III. Application of Natural Accumulation Rule

Plaintiff next argues that even if the natural accumulation rule is applied to this case, the jury found that the CTA could have allowed

plaintiff to leave its train at a place on the platform that was not covered in snow or ice. Thus, she argues, the natural accumulation rule does not relieve the CTA of its duty to provide plaintiff with a safe place to alight. She argues that there is no evidence in the record to support the appellate court's determination that requiring the CTA to provide a safe place to alight without engaging in snow removal would impose an unreasonable burden on the CTA and would bring the transit system to a halt. She argues that the CTA never introduced any evidence as to how it would have been inconsistent with the practical operation of the CTA's train to provide plaintiff with a safe place to alight without engaging in snow and ice removal. Plaintiff refers to the testimony that a canopy covered part of the platform. Patricia Majors testified that the canopy was "very small." Anthony Morales testified that the canopy covered less than half of the platform. Nonetheless, plaintiff believes that the train operator could have let plaintiff off the train underneath the canopy. She faults the CTA for failing to produce evidence that it would not have been feasible to allow plaintiff to exit the train under the canopy. In response, the CTA argues that it was plaintiff's burden to show that the CTA could have allowed plaintiff to alight on a safer part of the platform and thereby breached its duty to provide her with a safe place to alight from the train.

The burden to prove all the elements of a negligence claim remains on the plaintiff throughout the proceedings. It is not the defendant's burden to disprove negligence. *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 98 (2005). The trial court ruled that the CTA had no duty to remove snow or ice from the platform. Thus, it was plaintiff's burden to prove that the CTA could have fulfilled its duty to plaintiff in another way. Plaintiff failed to do so. Plaintiff presented no evidence that it was feasible or even possible to discharge all passengers under the canopy or in some other manner that would have provided passengers with a safe place to alight. Plaintiff cannot escape her burden of proof on the issue of breach of duty by attempting to shift that burden onto the CTA. Contrary to plaintiff's contention, she did not prove that the CTA breached its duty to her to provide a safe place to alight.

Further, plaintiff failed to prove that the last two factors in the duty analysis require the imposition of a duty on the CTA. Plaintiff

-14-

argues that the magnitude of the burden of guarding against the injury was minimal because the evidence showed the danger did not arise from an ongoing ice storm, but from a three-day-old sheet of ice. We have already rejected plaintiff's characterization of the evidence concerning the weather conditions existing both at the time plaintiff fell and for the two days preceding the accident. Further, we agree with the appellate court that it would be impractical to place a burden on the CTA to evaluate its train platforms each time a trains pulls in to determine which portion of each platform has the least accumulation of snow or ice. Plaintiff complains that the record contains no evidence supporting that conclusion. However, we may take judicial notice of the magnitude of the CTA's operations. See *Fujimura v. Chicago Transit Authority*, 67 Ill. 2d 506, 510 (1977). We also note that Theresa Williams of the CTA testified that, at the time of plaintiff's accident, the CTA's red line train ran 24 hours a day, 7 days a week. Thus, the appellate court did not err in finding that imposing such a burden on the CTA would be "overwhelmingly detrimental to the efficient performance of the transit system." 391 Ill. App. 3d at 671. Accordingly, we find that the trial court should have directed a verdict in favor of the CTA on the issue of its alleged duty to provide plaintiff with a safe place to alight.

## IV. Willful and Wanton Conduct

Plaintiff next argues that the appellate court erred in finding that the natural accumulation rule relieved the CTA of the duty to refrain from willful and wanton conduct. The appellate court did not separately address the willful and wanton conduct issue. Instead, it noted that plaintiff must prove that a duty exists to recover for negligence or for willful and wanton conduct and that, as a matter of law, no such duty was shown. Plaintiff argues that whether a particular act or omission constitutes willful and wanton conduct is a jury question. She argues that the evidence showed the CTA knew of the dangerous icy condition of the platform where plaintiff fell for at least two days prior to the accident and it failed to take any precautions to provide plaintiff with a safe place to alight. Plaintiff points to Patricia Majors' testimony concerning the existence of the ice for the two days prior to the accident and the evidence that the CTA had various employees whose job was to check the platforms

-15-

for safety, including the presence of ice and snow, and remove it and spread sand. Plaintiff notes Majors' testimony that she did not see any sand on the platform prior to or at the time of plaintiff's fall. Thus, according to plaintiff, the CTA did nothing at all to provide plaintiff with a safe place to alight despite its knowledge of the ice on the platform.

There is no separate and independent tort of willful and wanton conduct. *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 274 (1994). It is regarded as an aggravated form of negligence. *Sparks v. Starks*, 367 Ill. App. 3d 834, 837 (2006). To recover damages based upon a defendant's alleged negligence involving willful and wanton conduct, the plaintiff must allege and prove that the defendant owed a duty to the plaintiff, that the defendant breached the duty, and that the breach was the proximate cause of the plaintiff's injury. *Abrams*, 211 Ill. 2d at 257. The question of whether a duty exists is a question of law to be decided by the court. *Rhodes*, 172 Ill. 2d at 227.

Plaintiff rests her argument on the alleged failure of the CTA to remove ice and snow from the platform where plaintiff fell and to spread sand on the platform. As we have held, however, the CTA had no duty to remove natural accumulations of ice or snow from the platform, nor did it have a duty to warn of those conditions. Accordingly, the trial court should have directed a verdict in favor of the CTA on the issue of alleged willful and wanton conduct.


## CONCLUSION

We hold that the natural accumulation rule applies in this case and that the CTA had no duty to remove natural accumulations of snow and ice from its train platform, and no duty to warn of such accumulations. We further hold that the appellate court did not err in determining that the trial court should have directed a verdict in favor of the CTA in its entirety. Accordingly, we affirm the judgment of the appellate court.


*Appellate court judgment affirmed.*

-16-

JUSTICE FREEMAN, dissenting:

The court today holds that the natural accumulation rule relieves common carriers of the duty to provide passengers a safe place to alight. This conclusion not only ignores the Local Government and Governmental Employees Tort Immunity Act, but it is also at odds with this court's case law. I therefore respectfully dissent.

Generally, whether a duty exists turns on whether the plaintiff and the defendant stood in such a relationship to one another that the law imposes on the defendant an obligation of reasonable conduct for the plaintiff's benefit. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422 (2006). The inquiry involves four factors, including the reasonable foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *Marshall*, 222 Ill. 2d at 436-37. In applying this analysis, Illinois courts also impose a particular standard of care on those involved in four "special relationships" which are described in section 314A of the Restatement of Torts. *Iseberg v. Gross*, 227 Ill. 2d 78, 88 (2007); Restatement (Second) of Torts §314A (1965). The four special relationships giving rise to a duty to protect another from harm are: (1) carrier-passenger, (2) inn keeper-guest, (3) business invitor-invitee, and (4) voluntary custodian–protecting under certain limited circumstances. *Iseberg*, 227 Ill. 2d at 88.

Applying these factors, this court has long held that a common carrier owes its passengers the highest duty of care consistent with the practical operation of its conveyances. *Rotheli v. Chicago Transit Authority*, 7 Ill. 2d 172 (1955). The carrier is bound to furnish the passenger an opportunity to safely alight from the conveyance and reach a place of safety. *Katamay v. Chicago Transit Authority*, 53 Ill. 2d 27 (1972).

This case raises the question of whether "the natural accumulation rule" relieves a common carrier of its duty to passengers where snow and ice are concerned. In Illinois, the natural accumulation rule arose in the context of municipal liability for care of public streets and sidewalks. *Graham v. City of Chicago*, 346 Ill. 638 (1931). Municipalities are not liable for the failure to remove natural accumulations of snow and ice. The rule has also been applied to private landowners as well. *Riccitelli v. Sternfeld*, 1 Ill. 2d 133

-17-

(1953).

## Tort Immunity Act

The General Assembly has codified the natural accumulation rule with respect to municipalities in section 3–105 of the Local Governmental and Governmental Employees Tort Immunity Act. Although the CTA is a legislatively created governmental agency, the General Assembly specifically excluded it from the Tort Immunity Act's protection. 745 ILCS 10/2–101(b) (West 2008). The legislature has also codified the rule with respect to private citizens arising from their negligent attempts to remove ice and snow from sidewalks adjoining their residences in the Snow Removal Act. See 745 ILCS 75/1 (West 2008). The legislature's action indicates its intent that the CTA not receive the benefit of the natural accumulation rule, although other local governmental agencies do, as well as homeowners. The General Assembly's action therefore forecloses the court's holding today.

## Illinois Common Law

Other reasons, apart from the Tort Immunity Act, also support the conclusion that the natural accumulation rule has no application to this case. This court has never explicitly addressed whether the natural accumulation rule trumps a common carrier's duty of care.[1] Our appellate court has concluded that the rule does apply to common carriers (*Serritos v. Chicago Transit Authority*, 153 Ill. App. 3d 265 (1987); *Sheffer v. Springfield Airport Authority*, 261 Ill. App. 3d 151 (1994)), although I question the soundness of its analysis. The

---

[1]The court cites *McElligott v. Illinois Central R.R. Co.*, 37 Ill. 2d 459 (1967), as a case in which the natural accumulation rule was applied to a common carrier. This is somewhat misleading in that the plaintiff's decedent in that case was not the carrier's passenger. Rather, he was driving a car which slid on an street which was belonged to the carrier as part its right of way. As such, the duty of care owed in that case was that of ordinary care. See *Katamay*, 53 Ill. 2d at 31 (explaining that status of being a passenger triggers the common carrier's duty to the highest degree of care for the safety of an individual).

appellate court's conclusion is predicated on the fact that the natural accumulation rule shields a business invitor from any liability to invitees from the failure to remove or take other precautions against dangers inherent in natural accumulations of snow and ice. This is so even though a business invitor ordinarily owes invitees a duty of reasonable care. See generally *Smalling v. La Salle National Bank of Chicago*, 104 Ill. App. 3d 894 (1982); *Watson v. J.C. Penney Co.*, 237 Ill. App. 3d 976 (1992).

Applying the same reasoning, the appellate court has similarly used the rule to shield common carriers from liability to passengers from the failure to remove or take precautions against natural accumulations of snow and ice. *Serritos*, 153 Ill. App. 3d at 271-72. In both situations, the holdings are based on the fact that in northern climates, like ours, where ice and snow are a fact of life, people are aware of the hazards posed by such conditions, and it is impractical to require property owners and carriers to remove snow and ice. See *Cronin v. Brownlie*, 348 Ill. App. 448 (1952). In other words, snow and ice pose dangers that are open and obvious to all who live in climates such as ours.

The appellate court's analysis is problematic on several levels. None of the cases satisfactorily reconcile the natural accumulation rule with the duties that the law recognizes as owed to either an business invitee or a common carrier passenger. In this respect, the appellate court's holdings are at odds with this court's decision in *Ward v. K mart Corp.*, 136 Ill. 2d 132 (1990). There, this court discussed the duties owed by a store to its customers with respect to conditions on its premises. The customer had walked into a concrete post, which he did not see because he was carrying a large mirror which obstructed his view. This court rejected K mart's contention that it had no duty to warn of the condition because it was not foreseeable that its customers would fail to observe the concrete post. We specifically recognized that the " 'obviousness' of a condition or the fact that the injured party may have been in some sense 'aware' of it may not always serve as adequate warning of the condition and of the consequences of encountering it." *Ward*, 136 Ill. 2d at 148-49, citing Restatement (Second) of Torts §343A (1965). The defendant therefore had a duty to protect the customer from the condition. *Ward*, 136 Ill. 2d at 149.

In the wake of *Ward*, a business owner's duty of reasonable care for conditions on its premises extends to those whom it should expect will not realize the danger or will fail to protect themselves against it. According to *Ward*, "[w]hether in fact the condition itself served as adequate notice of its presence or whether additional precautions were required to satisfy the defendant's duty are questions properly left to the trier of fact. The trier of fact may also consider whether the plaintiff was in fact guilty of negligence contributing in whole or in part to his injury, and adjust the verdict accordingly." *Ward*, 136 Ill. 2d at 156-57. *Ward* also acknowledged the "manifest trend of the courts in this country is away from the traditional rule absolving, *ipso facto*, owners and occupiers of land from liability for injuries resulting from known or obvious conditions" on their land. *Ward*, 136 Ill. 2d at 150.

As noted, this court's adoption of the Restatement position reflected a growing judicial awareness that occupiers of premises are generally in a better position in modern society to protect the public from hazards than are invitees who must go into public places as part of daily life. This view serves to encourage landowners to repair defects, rather than to keep them "open and obvious" in order to avoid liability under the traditional approach. It thus appropriately balances the interests of landowners and invitees by setting out "a requirement of due care to make the conditions reasonably safe–a requirement that might well be satisfied by warning or obviousness in any given case, but that would not be so satisfied invariably." 5 F. Harper, F. James & D. Gray, *The Law of Torts* §27.13, at 241 (2d ed. 1986).

*Ward*'s reliance on section 343 of the Restatement has significance to the application of the natural accumulation rule. Simply put, the rule is inconsistent with the principles stated in section 343 because it dilutes the owner's duty and undermines basic principles of public responsibility. *Hammond v. Allegretti*, 262 Ind. 82, 311 N.E.2d 821 (1974). Courts in other jurisdictions have recognized as much. See *Kremer v. Carr's Food Center, Inc.*, 462 P.2d 747 (Alaska 1969) (relying on Restatement to reject the natural

accumulation rule).[2] For example, in *Kremer v. Carr's Food Center, Inc.*, a grocer's customer fell on an icy rut on an unsalted ice- and snow-covered parking lot maintained for the use of the grocer's customers. The Alaska Supreme Court held that the case was governed by existing Alaska tort case law which approved the definition of the duty owed by a possessor of land to an invitee as set forth in section 343 of the Restatement:

> "Section 343 is controlling here. A jury could have found: (a) that Carr's possessed the parking lot and knew the condition of its surface, (b) that Carr's should have realized that this condition involved an unreasonable risk of harm to its business invitees, (c) that Carr's should have expected that its business invitees would not discover or realize the danger, or should have anticipated that they would fail to protect themselves against a danger they did discover or realize, or should otherwise have anticipated harm to invitees despite the fact that the danger was known or obvious to them, and (d) that Carr's failed to exercise reasonable care to protect business invitees, such as [plaintiff], from the dangerous surface conditions in its parking lot." *Kremer*, 462 P.2d at 749-50.

Relevant here too is the court's thoughts on the weather:

> "Alaska's climatic conditions do not metamorphize all risks arising from ice and snow conditions into reasonable risks for the business invitee. Nor are we persuaded by appellee Carr's policy argument that in Alaska it would result in unreasonable costs to the private-commercial possessor of land to require the possessor to clear ice and snow, or otherwise remedy conditions which amount to unreasonable risks of harm to its business invitees." *Kremer*, 462 P.2d at 752.

The court noted that the "mere fact" that "snow and ice conditions prevail for many months throughout various locations in Alaska" was not "in and of itself sufficient rationale for the insulation of the possessor of land from liability to his business invitee." *Kremer*, 462

---

[2]I note that *Kremer* was cited with approval by this court in *Ward*. *Ward*, 136 Ill. 2d at 150.

P.2d at 752.

Similarly, the Michigan Supreme Court cited its recognition of the principles in section 343 of the Restatement as the basis for its overruling of the natural accumulation rule. *Quinlivan v. Great Atlantic & Pacific Tea Co.*, 395 Mich. 244, 235 N.W.2d 732 (1975). The court explicitly rejected the "the prominently cited notion that ice and snow hazards are obvious to all and therefore may not give rise to liability." *Quinlivan*, 395 Mich. at 261, 235 N.W.2d at 740. See also *Isaacson v. Husson College*, 297 A.2d 98 (Me. 1972); M. Polelle, *Is the Natural Accumulation Rule All Wet?* 26 Loy. U. Chi. L.J. 631, 646-48 (1995) (noting that most states have rejected the natural accumulation rule in favor of a standard of due care).

As I indicated earlier, the appellate court's application of the natural accumulation rule to common carriers was predicated on the basis that the rule shields business owners from liability for their invitees. That rationale is questionable in light of this court's decision in *Ward* and its reliance on section 343 of the Restatement of Torts. For that reason, I would not apply the rule to common carriers.

Conclusion

In view of both Illinois statutory and common law, I would hold that a common carrier's standard of care trumps the natural accumulation rule. That is, the duty of care should extend to the kind of risk encountered by plaintiff here, a risk which is not only foreseeable but is likely to cause injury to passengers. It appears from the trial testimony that the CTA has employees whose specific job responsibilities include checking for safety from snow and ice. Therefore, it is not unreasonable or impractical to impose such a duty on the carrier as the court today states. Slip op. at 13. Certainly, it is not unduly burdensome for a conductor to warn passengers as they alight from the train to watch for ice on the platform. This would not impose any greater burden than already imposed on the CTA as to other sorts of open and obvious conditions, such as an extended platform flat or unnatural accumulations of water and ice. Nor would it render the CTA absolutely liable whenever a passenger slipped on ice or snow because, under *Ward*, a jury would have to decide whether the parties acted reasonably.

-22-

I must also point out that today's decision is at odds with this court's recent decision in *Marshall v. Burger King Corp.*, 222 Ill. 2d 422 (2006). There, a majority of this court held that a special relationship, standing alone, is sufficient to establish the affirmative duty to protect a business invitee from the tortious conduct of a third party. The plaintiff, who was in the Burger King restaurant, was injured by a car which crashed through the wall of the building. The court held that it was a jury question as to whether Burger King's decision not to have concrete pillars and poles outside the restaurant comported with its duty to its patrons. If Burger King has a duty to protect its diners from an airborne car, then the CTA should also have a duty protect its passengers from icy conditions on its train platforms. See J. Powell, *Marshall v. Burger King Corp.: Making a Mess of "Duty" For Businesses in Illinois*, 28 N. Ill. U. L. Rev. 95, 95 n.1 (Fall 2007).

Finally, I am disappointed by the court's failure to acknowledge any of the legal arguments made in this dissent, even though these arguments were raised by the parties. Such a failure unfortunately serves only to leave the impression of a result-oriented approach to judicial decisionmaking that undercuts public confidence in the courts. The parties, as well as the people of this state, deserve opinions from this court which are in harmony with the statutes passed by our legislature and which reconcile decisional law. As I have pointed out, the General Assembly has not given the CTA the benefit of the natural accumulation rule. This represents an explicit statement of the public policy of this state that I, unlike my colleagues, am unwilling to ignore. By its actions today, the court has indicated that it can better form the public policy of this state than can the General Assembly, even though this court regularly states that it is the General Assembly that is the branch of government uniquely suited for that role. See *Boub v. Township of Wayne*, 183 Ill. 2d 520, 535 (1998). In Chicago, when a snow storm hits, elected officials often tell citizens to stay off of the roads and to use public transportation in order to facilitate snow removal measures. Although municipalities are immunized by the Tort Immunity Act from liability for snow removal, the CTA is not, which serves to encourage citizens to use it as directed by city officials. Today's decision ignores the protection that the General Assembly has seen fit to give the users of

the CTA and puts those citizens who follow officials' directions in potential harm's way with no recourse for the damages they might incur if injured on an icy CTA platform. I, therefore, would reverse the decision of the appellate court and reinstate the jury's verdict in favor of plaintiff.

JUSTICE KILBRIDE joins in this dissent.

Dissent Upon Denial of Rehearing

JUSTICE FREEMAN, dissenting:

The natural accumulation rule–or the "Massachusetts rule" as it is commonly known and referred to in treatises and courts around the nation (W. Prosser & W. Keeton, Torts §61, at 427-28 (5th ed. 1984))–is the basis for the majority's decision in this case. The "Massachusetts rule" allows a property owner to skirt liability for failing to remove a natural accumulation of snow and ice.

Significantly, within one week of the issuance of the court's opinion in this case, the Supreme Judicial Court of Massachusetts unanimously did away with the "Massachusetts rule" in *Papadopoulos v. Target Corp.*, 457 Mass. 368, 930 N.E.2d 142 (2010). With that decision, Massachusetts has now aligned itself with the majority of states which follow the reasonable care standard that I outlined in my original dissent.

Recognizing the significance of that decision, the plaintiff now seeks rehearing on the point, urging that this court at the very least reconsider the case in light of *Papadopoulos*.

Not surprisingly, the court ignores the request. I say not surprisingly because the court previously ignored the direct implications of the Tort Immunity Act for this case or the viability of the natural accumulation rule in the aftermath of this court's decision in *Ward v. K mart*, as I pointed out in my original dissent. *Papadopoulos* presents the court with another opportunity to explain why it insists on perpetuating a rule that is obsolete and no longer has a basis in modern Illinois tort law regarding premises liability. The

court passes on this opportunity and continues to be content simply to stand by its "recognition" of the dangers posed by natural accumulations of snow and ice. To the court, imposing an obligation to remedy those conditions " 'would be so unreasonable and impractical as to negate the imposition of a legal duty to do so.' " Slip op. at 13, quoting *Trevino v. Flash Cab Co.*, 272 Ill. App. 3d 1022, 1029-30 (1995). These arguments were the central reason for the creation of the Massachusetts rule, which even the Massachusetts supreme court has now abandoned.

The Massachusetts court rejected the notion that liability is negated based on the impracticalities or the unreasonableness of snow and ice removal:

> "This argument [*i.e.*, unreasonableness and impracticality in northeastern winter climate] has proven unpersuasive to every other Supreme Court in New England, which have all rejected the so-called Massachusetts rule of natural accumulation. The Supreme Court of Rhode Island cogently defeated this argument by stating:
>
> > 'We believe that today a landlord, armed with an ample supply of salt, sand, scrapers, shovels and even perhaps a snow blower, can acquit himself quite admirably as he takes to the common passageways to do battle with the fallen snow, the sun-melted snow now turned to ice, or the frozen rain. We fail to see the rationale for a rule which grants a seasonal exemption from liability to a landlord because he has failed to take adequate precautions against the hazards that can arise from the presence of unshoveled snow or unsanded or salt-free ice found in the areas of his responsibility but yet hold him liable on a year round basis for other types of defects attributable to the workings of mother nature in the very same portions of his property.' *Fuller v. Housing Auth. of Providence*, 108 R.I. 770, 773, 279 A.2d 438 (1971)." *Papadopoulos*, 457 Mass. at 380, 930 N.E.2d at 151-52.

I also take issue with the court's implicit concern that to impose liability here would somehow overburden the CTA. As the Massachusetts court recognized, the use of a reasonable care standard

does not impose any "special burdens" on property owners:

> "If a property owner knows or reasonably should know of a dangerous condition on its property, whether arising from an accumulation of snow or ice, or rust on a railing, or a discarded banana peel, the property owner owes a duty to lawful visitors to make reasonable efforts to protect lawful visitors against the danger." *Papadopoulos*, 457 Mass. at 383, 930 N.E.2d at 154.

According to the Massachusetts court, under the reasonable care standard it is for the finder of fact to determine "what snow and ice removal efforts are reasonable in light of the expense they impose on the landowner and the probability and seriousness of the foreseeable harm to others." *Papadopoulos*, 457 Mass. at 384, 930 N.E.2d at 154. More importantly, the court acknowledged that the use of such a standard "does not make a property owner an insurer of its property; 'nor does it impose unreasonable maintenance burdens.' " *Papadopoulos*, 457 Mass. at 384, 930 N.E.2d at 154, quoting *Mounsey v. Ellard*, 363 Mass. 693, 709, 297 N.E.2d 43, 53 (1973). Rather, under the standard, the snow removal

> "reasonably expected of a property owner will depend on the amount of foot traffic to be anticipated on the property, the magnitude of the risk reasonably feared, and the burden and expense of snow and ice removal. Therefore, while an owner of a single-family home, an apartment house owner, a store owner, and a nursing home operator each owe lawful visitors to their property a duty of reasonable care, what constitutes reasonable snow removal may vary among them." *Papadopoulos*, 457 Mass. at 384, 930 N.E.2d at 154.

In light of the above, I continue to believe that the court's decision in this case is wrong on both a statutory and a common law basis. I would grant rehearing so that this court can issue an opinion which does not ignore the important issues raised in this case.

JUSTICE KILBRIDE joins in this dissent.