2023 IL App (1st) 220792-U
No. 1-22-0792

FIRST DIVISION
September 11, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| AMBER WOODS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17 M1 302525 |
| | ) | |
| PACE BUS, INC., | ) | |
| | ) | The Honorable |
| Defendant-Appellee. | ) | Sondra N. Denmark, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

## ORDER

*Held*:     We reverse the trial court's order granting defendant-appellee Pace Bus, Inc.'s motion for a directed verdict. The "natural accumulation rule" did not eliminate defendant's duty, as a common carrier, to provide passengers with a safe place to alight. Further, the evidence presented a substantial factual dispute as to whether Pace breached its duty when it let plaintiff off its bus in the street instead of pulling over to the curb.

¶ 1     In this slip-and-fall personal injury action, plaintiff-appellant Amber Woods appeals from the circuit court order granting judgment to defendant-appellee Pace Bus, Inc. (Pace) upon its motion

for a directed verdict. For the following reasons, we find that the motion for directed verdict was improperly granted. Thus, we reverse and remand for new trial.

¶ 2    BACKGROUND

¶ 3    This case stems from an incident in which Woods slipped and fell after she stepped off a bus operated by Pace at 6:20 p.m. on December 18, 2016.

¶ 4    The basic facts of the incident are undisputed.  On the evening in question, Woods was a passenger on a Pace bus that stopped near the intersection of Austin Boulevard and Roosevelt Avenue in Cicero, Illinois. The bus was driven by Tommie Connet, who was an agent of Pace. It is undisputed that there was naturally accumulating ice, slush, or snow in the area at the time of the incident.

¶ 5    Connet stopped the bus near the intersection to allow passengers to depart from the front door of the bus. To the right of the bus was a car parked on the street near the intersection. Connet did not attempt to bring the bus flush with the curb before stopping to let passengers off. Instead, Connet kept the bus straight as he brought the bus to a stop, such that passengers would be let off in the street. That is, Connet did not attempt to position the bus on an angle, so that the front door would be closer to the curb.

¶ 6    After the bus came to a stop, Woods exited from the front door and stepped onto the street. Woods walked three steps in the direction of the curb before she slipped and fell.[1] Woods suffered a fractured ankle.

¶ 7    Woods commenced a single-count negligence lawsuit against Pace. She alleged that Pace was negligent in failing to provide a safe place for her to alight from its vehicle and failing to use the

_____

[1] The record on appeal includes a segment of video surveillance recording from cameras aboard the bus, as well as still images taken from that footage. That video recording shows Woods alighting from the front door of the bus and falling down in the street. Although the video recording was not admitted, several still images from that footage were admitted as trial exhibits.

highest degree of care in selecting a place for her to alight. She alleged that as a proximate result, she slipped and fell on an "icy manhole cover."

¶ 8        **Pretrial Motions**

¶ 9       In July 2019, Pace moved for summary judgment. Pace argued that under the "natural accumulation rule" discussed in *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215 (2010), it had "no duty to remove a natural accumulation of snow, slush or ice from a location where a passenger departs" and no duty to warn of the existence of such a natural accumulation.

¶ 10      Pace asserted that there was no dispute that Woods slipped and fell on a natural accumulation of snow, slush or ice. Thus, it urged that it "owed no duty to [Woods] with respect to the natural accumulation of snow, slush or ice upon which she fell." According to Pace, Woods sought to impose a duty on Pace to "analyze the street, curb, and/or sidewalk at every single passenger disembarking location," which would bring the transit system "to a standstill."

¶ 11      On October 23, 2019, the court (Hon. Lloyd James Brooks) heard oral argument and denied Pace's motion for summary judgment. In so doing, the court acknowledged that Pace was not under a duty to remove naturally accumulating ice or snow. However, it remarked that "there is a duty on the bus driver to make an attempt to have safe passage for the passenger to disembark even in bad weather," and that there was an issue of fact as to whether this duty was met. The court remarked that it was "not entirely clear that where the bus driver stopped may or may not have been the safest spot" and that "it may be up to a jury to decide whether or not the bus driver determined that either this was the best place and so he fulfilled his duty or that there was no safe place * * *. Or if, in fact, maybe there was a better place and the bus driver just didn't choose it."

¶ 12      Pace subsequently moved to reconsider the denial of its summary judgment motion or, in the alternative, to certify questions for interlocutory appeal pursuant to Supreme Court Rule 308(a).

In seeking reconsideration, Pace argued that the natural accumulation rule discussed in *Krywin* relieved common carriers of any duty to detect naturally occurring ice or snow.

¶ 13    Pace alternatively sought certification of two questions: (1) "Does a common carrier have a duty to an alighting passenger to provide a safe place to alight when there is a natural accumulation of snow, slush or ice prevalent on the streets and sidewalks of the area where said passenger is alighting?" and (2) "Under the natural accumulation rule, does a common carrier have a duty to detect a natural accumulation of snow, slush or ice where said passenger then slips and falls on said natural accumulation while alighting?"

¶ 14    On April 30, 2020, the court issued an order denying Pace's motion to reconsider. In doing so, the trial court pointed out that, while the supreme court in *Krywin* held that the CTA had no duty to clear the snow from a train platform, it "held that the passenger could have proved the transit authority could have fulfilled its duty to alight in another way." The trial court also pointed out that *Krywin* included language that " 'it is obvious that a bus driver has a much better opportunity to determine the best place to let his or her passengers off the bus than does a train operator.' " (quoting *Krywin*, 238 Ill. 2d at 234). In denying the motion to reconsider, the circuit court found there was an "issue of fact as to whether a safe place existed for the bus driver to allow [Woods] to alight." In the same order, the trial court denied Pace's request to certify questions under Rule 308.

¶ 15    A jury trial commenced on May 31, 2022.[2] In opening argument, Woods' counsel argued the evidence would show that Pace "failed to provide a safe place for [Woods] to alight."

¶ 16    **Testimony of Bus Driver Tommie Connet**

---

[2] Whereas the Hon. Lloyd J. Brooks ruled upon Pace's motion for summary judgment, the Hon. Sondra N. Denmark presided over the trial and ruled upon Pace's motion for directed verdict.

¶ 17    Woods's counsel called Connet as an adverse witness. Connet testified that he had worked as a Pace bus driver for 18 years. He acknowledged that Woods fell after slipping on a snow-covered manhole cover after departing his bus.

¶ 18    Connet agreed that he stopped the bus about 12 feet from the curb.  However, he disagreed with the suggestion that it was "not safe to let [Woods] off in the middle of the public street." He explained that "we are trained to pull the bus flush to the curb when you can to allow the passenger to get off safely," but that the practice was to let passengers off in the street if he was "unable to get the bus flush with the curb."

¶ 19    Connet testified that when he stopped to let Woods off, a parked car prevented him from pulling flush with the curb:

> "[A]the time there was a vehicle that was adjacent parked  *** in the bus service zone, so you couldn't get the bus flush in my training to the curb to allow the passengers [to] get off safely. So when that happens, you can't pull the front end of the bus in because that's a danger to oncoming cars as the back end of the bus in in the street. If you pull in the front end, it allows other cars to maybe run into the bus causing the bus to be a projectile going over the curb and maybe injuring passengers.
>
> Or you don't pull it in because you got to keep the bus flush. That's what I did because of the parked vehicle to my right blocking the curb lane. So the safest thing to do is to pull the bus straight ahead and then lower the bus and allow the passenger to get off in the street and then go to the curb."

Connet stated that this was what he did when he stopped to let Woods off the bus. When Woods' counsel asked if it is a "better course of action to let the passenger off at the curb" instead of in the street, Connet answered: "It depends."

¶ 20 Connet acknowledged that Pace buses have video cameras, but he did not know whether the cameras worked on the bus at the time of the incident. Connet did not know whether there was any video footage of Woods' fall.

¶ 21 On cross-examination by Pace's counsel, Connet agreed that it was dark and the weather was snowy when he stopped to let Woods off the bus. He agreed there was "naturally accumulating" snow, slush, and ice on the street and curb near the intersection. After Woods fell, he approached her and saw an accumulation of "black ice." Connet testified that he could not see that ice from the driver's seat of the bus.

¶ 22 Elsewhere on cross-examination, Connet agreed that he did not pull the bus all to way to the curb because of a "parked car in the parallel parking spot nearest the corner." He agreed with Pace's counsel that he was trained not to "pull the bus in on an angle toward the curb" in such situations so that the rear end of the bus would not be "hanging out in the through lane." He similarly agreed that if he pulled the bus closer to the curb on an angle and it was struck from behind, the bus "could be propelled onto the curb" where it could strike pedestrians. He agreed that he was trained to "stay away from the curb and use the parked car as a guard or shield" for departing passengers, and that he followed his training on the evening in question.

¶ 23 Connet also agreed with Pace's counsel that it is not feasible for a bus driver to get off and examine the snow and ice at an intersection, because it would "grind the transit system to a halt."

¶ 24 On re-direct examination, Connet testified that the bus was 40 feet long. He maintained that there "wasn't enough room to get the bus flush" to the curb.

¶ 25      **Prior Deposition Testimony**

¶ 26      Following Connet's testimony, the jury heard the prior deposition testimony of Dr. Ouida Brown, an orthopedic surgeon who operated on Woods' fractured ankle. The jury then heard the prior deposition testimony of Denise Seaman regarding hospital bills for Woods' surgery and treatment.

¶ 27      **Woods' Trial Testimony**

¶ 28      Woods testified that at time of the incident she used the same bus route to commute to work at Walmart five days per week. As part of her commute home, she got off the Pace bus at the intersection of Austin Boulevard and Roosevelt.  She had been a passenger on this bus route hundreds of times before her injury.

¶ 29       On December 16, 2016, Woods took the bus to return home after her shift ended at 6:00 p.m. She recalled that she was the first passenger to step off after the bus after it stopped at the intersection. She slipped and fell in the street as she attempted to walk to the curb.

¶ 30      Woods was shown a number of still images (Plaintiff's Exhibits 1 through 6) and testified that they were accurate depictions of the scene. The first time-stamped image (Plaintiff's Exhibit 1) shows Woods standing near the front door, preparing to alight the bus, at 18:20:48. An image from one second later (Plaintiff's Exhibit 2) shows the bus doors open and Woods preparing to descend to the street.  Subsequent images show that Woods stepped onto the street and began to walk toward the curb. The last image (Plaintiff's Exhibit 6) shows Woods on the ground in the street.

¶ 31      Woods stated that the images came from a video she previously viewed.[3] However, when Woods' counsel attempted to play that video footage, Pace's counsel objected due to lack of foundation. During a sidebar, Woods' counsel argued that Woods' testimony provided adequate foundation

_____

[3] It is undisputed that the still images in Wood's trial exhibits were taken from the same video footage referenced elsewhere at trial.

for the video footage. The court stated it would not admit the video evidence because "[Woods] can't authenticate that it has not been edited."

¶ 32    Woods proceeded to testify that that, every other time she had taken this bus route, the bus stopped right at the curb at this particular intersection. The incident on December 16, 2016 was the first instance where the bus let her off in the street. Woods stated her belief that Connet could have "pulled closer to the curb."

¶ 33    On cross-examination, Woods admitted she had no training or experience operating a bus. She agreed that it was dark and that she "fell on a natural accumulation of snow, slush or ice" at the intersection. Woods acknowledged that a car was parked on Roosevelt Road, and that the car was "roughly adjacent to the rear wheel of the bus." Woods agreed that when the doors opened just before she stepped off the bus, she did not notice anything that appeared to be "unsafe, improper, and unreasonable."

¶ 34    On redirect examination, Woods stated she did not believe anything precluded Connet from pulling over closer to the curb before letting her off. On recross examination, she admitted she had no knowledge of bus safety and did not know how to park a bus.

¶ 35    Woods rested following her testimony. At that point, trial adjourned for the day.

¶ 36    **Pace's Motion for Directed Verdict**

¶ 37    When proceedings resumed the following day, Pace moved for a directed verdict.[4] Pace argued that the "natural accumulation rule prevails over Pace's duty to provide a safe place for passengers to alight." Pace urged it had no duty concerning the natural accumulation of snow, slush or ice that

_____

[4] The trial court sometimes referred to Pace's motion as one seeking a "directed finding" rather than a directed verdict.

Woods slipped on. In opposition, Woods' counsel argued that there was a jury question as to whether or not Connet "selected an unsafe place for [plaintiff] to alight."

¶ 38    Later that day, the court informed the parties that it was "ruling for the defendant's motion for directed finding." In so doing, the court remarked that it is "undisputed that the plaintiff fell on the sheet of ice after stepping off the bus" and that "snow and ice clearly prevailed in the general vicinity" of the incident. The court summarized Connet's testimony:

> "Mr. Connet indicates he could not pull to the curb, so he let [Woods] exit at the best place he could. Because he was unable to actually pull the vehicle ***, a 40-foot bus, along the curb without angling it based on his training, that was clear in the testimony. So again, the issue being that the plaintiff is of the opinion that the defendant being Pace did not provide the plaintiff with a safe place to alight from the Pace bus."

¶ 39    The court proceeded to state: "[t]he Court finds that the driver Tommie Connet's testimony to be credible." It remarked that "based on Mr. Connet's training, he indicated that the vehicle, being a 40-foot bus, needed to be flush to the curb or he had to pull up and let her out, which is what he did." The court explained that "although the defendant was responsible for letting the plaintiff off the bus, the testimony by Mr. Connet again indicates he did what he could based on the conditions that he had before him." In announcing its ruling, the court again referred to the motion as one for a directed "finding" and credited Connet's testimony:

> "Based on all of those facts in the case law that the Court reviews, the Court has no choice but to grant the motion for directed finding as the defendant did not have the duty, as the plaintiff that – as the

plaintiff argues that the plaintiff was to – allowed to exit the bus at a safe place. Mr. Connet's testimony to the Court indicates he let the defendant off where he could based on the bus lane being blocked by that vehicle."

¶ 40    On the same date, the court entered a written order granting the motion for directed verdict and dismissing the matter with prejudice. Woods filed a timely notice of appeal from that order.

¶ 41                                                ANALYSIS

¶ 42    On appeal, Woods asserts that two errors require reversal and remand for a new trial. Woods primarily contends that the trial court erred in granting Pace's motion for directed verdict. She asserts that the court improperly weighed the trial evidence and made credibility determinations, as if it was deciding a motion for directed finding in a non-jury case. Woods avers that, under the correct standard, the motion for directed verdict should have been denied because there was a factual issue for the jury to resolve, namely "whether Pace was negligent when it dropped Woods off in the middle of the street." In other words, she argues there was a fact question as to whether Pace breached its duty to provide her with a safe place to alight. Separately, Woods argues that the trial court abused its discretion when it declined to admit the video footage of the slip and fall incident.

¶ 43    Pace responds that the trial court correctly granted the motion for directed verdict pursuant to the "natural accumulation rule." It claims it owed Woods no duty with respect to the ice, snow, or slush that Woods slipped on. Pace otherwise asserts that the trial court did not abuse its discretion with respect to the video footage.

¶ 44    For the reasons below, we agree with Woods that there was a substantial factual question as to whether Pace breached its duty to let her off at a safe place. In turn, the motion for directed verdict should have been denied.

¶ 45    **Standard of Review Upon a Directed Verdict**

¶ 46    "A directed verdict *** is properly entered in those limited cases where 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern R.R. Co.,* 37 Ill. 2d 494, 510 (1967)).

¶ 47    A directed verdict is inappropriate if there is a substantial factual dispute. See *Jones v. DHR Cambridge Homes, Inc.*, 381 Ill. App. 3d 18, 28 (2008) ("A directed verdict is granted improperly where there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." (Internal quotation marks omitted.) A directed verdict is improper "where disputed issues of fact exist requiring either the assessment of witness' credibility or the election between conflicting evidence. [Citation.]" *Johnson v. Chicago Transit Authority,* 248 Ill. App. 3d 91, 93 (1993) (holding that motion for directed verdict was properly denied where there was "conflicting testimony presented concerning whether plaintiff was inside the crosswalk when the collision occurred.")

¶ 48    The *de novo* standard of review applies to a ruling on a motion for directed verdict. *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). "On review, all of the evidence must be construed in the light most favorable to the nonmoving party." *Id.*

¶ 49    Having set forth the proper standard, we turn to Woods' contention that the trial court applied the wrong legal standard in deciding the motion for directed verdict. Woods points out that the trial

court referred to the motion as one for a directed "finding" rather than a directed verdict. She suggests that the trial court mistakenly treated Pace's motion as one for a directed finding in a bench trial pursuant to section 2-1110 of the Code of Civil Procedure. 735 ILCS 5/2-1110 (West 2020). Woods notes that the trial court's remarks reflect that it weighed the credibility of Connet's testimony in deciding the motion in Pace's favor. Woods asserts that this application of the "wrong legal standard" to the motion "is *prima facie* reversible error."

¶ 50 Woods is correct that a motion for a directed finding differs significantly from a motion for a directed verdict. Pursuant to section 2-1110 of the Code of Civil Procedure, a motion for directed finding occurs in a *bench trial*, where the court acts as factfinder and weighs the evidence. 735 ILCS 5/2-1110 (West 2020) "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence."). Upon a motion for directed finding, "the trial court does not view the evidence most favorably to the plaintiff, but rather (1) determines whether the plaintiff has made out a *prima facie* case, then (2) weighs the evidence, including that which favors the defendant." *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 311 (2000). That is, the trial court at a bench trial may independently assess credibility to decide if a directed finding is warranted. *Barnes v. Michalski*, 399 Ill. App. 3d 254, 262 (2010) ("when granting a motion pursuant to section 2-1110 *** the court might well resolve conflicts in the evidence and assess the credibility of witnesses").

¶ 51 In contrast, a directed verdict applies in a jury trial and is governed by the standard set forth by our supreme court in *Pedrick*, 37 Ill. 2d 494. "When a party moves for a directed verdict in a jury trial, the trial court views all the evidence in an aspect most favorable to the opponent and grants the

motion only if the evidence so overwhelmingly favors the movant that no contrary verdict could ever stand." *Barnes*, 399 Ill. App. 3d at 262 (citing *Pedrick*, 37 Ill. 2d at 510)); *Zankle*, 311 Ill. App. 3d at 311 (2000) ("*Pedrick* applies to a *jury* trial, where a motion for a directed verdict asks the trial court to take the case from the fact finder. In a *bench* trial, where the trial court is the fact finder, a motion for a 'directed verdict' is governed not by *Pedrick* but by section 2-1110 of the Code of Civil Procedure [Citation]". (Emphases in original.)). The different standard for a directed verdict reflects that it is the role of the jury, not the trial court, to weigh the evidence and make findings of fact. See *Barnes*, 399 Ill. App. 3d at 262 ("Viewing the evidence in a light most favorable to the opponent is a way to avoid intruding upon the province of the jury; we thereby allow the jury an opportunity to regard the evidence in a light most favorable to the opponent, if it chooses to do so.").

¶ 52 Although this was a jury trial, the court's remarks suggest that it made factual determinations in granting a directed verdict. The trial court commented that it determined that Connet's testimony was "credible" with respect to his statements that he acted in accordance with his training. Moreover, the trial court twice referred to the motion as one for a directed "finding." Although we cannot know the trial court's internal reasoning, it appears that it may have weighed the evidence as if it was deciding a section 2-1110 motion for directed finding, rather than assess whether the evidence "so overwhelmingly favor[ed] the movant [Pace] that no contrary verdict based on that evidence could ever stand." *Krywin*, 238 Ill. 2d at 225.

¶ 53 Even if the trial court did not employ the proper inquiry, however, it would *not* require automatic reversal as Woods suggests. This is because our role is to review the correctness of the underlying judgment, regardless of the trial court's stated reasoning. *Fifth Third Bank v. Brazier,* 2019 IL App (1st) 190078, ¶ 13 ("The appellate court reviews the judgment of the circuit court and not the

reasons given for that judgment, and we may therefore affirm the circuit court based on any reasons found in the record."). Thus, regardless of whether the trial court applied the correct standard, we must review *de novo* whether Pace was entitled to a directed verdict.

¶ 54 We thus turn to Pace's contention that it was entitled to directed verdict under the "natural accumulation rule" discussed by our supreme court in *Krywin*, 238 Ill. 2d 215. Because there was no dispute that Woods slipped on a natural accumulation of ice or snow, Pace contends that application of the rule means that it had no legal duty to Woods upon which it could be found negligent. See *id.* at 225 ("To recover damages based upon negligence, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury. [Citation.]"). Woods' position is that the natural accumulation rule does not preclude liability for failure to provide a safe place for a passenger to depart.

¶ 55 ***Krywin* and the Natural Accumulation Rule**

¶ 56 As in the trial court, the parties' arguments largely rely on the supreme court's decision in *Krywin*, which discussed the duties of a common carrier and the natural accumulation rule. We thus review that decision in detail.

¶ 57 In *Krywin,* the plaintiff alleged that she was a passenger on a Chicago Transit Authority (CTA) train. *Id.* at 218. As plaintiff exited the train at an elevated station, she slipped on snow and water on the platform. *Id.* She filed a lawsuit containing a negligence count (count I) and a count alleging willful and wanton conduct (count II). *Id.*

¶ 58 At trial, plaintiff testified that there was snow on the platform when she exited the train. Another witness testified that it was raining and that there was ice on the platform where plaintiff fell. *Id.* at 220. Witnesses also testified that a portion of the train platform was covered by a canopy. *Id.* at

219-20. The CTA moved for a directed verdict, arguing that the CTA had no duty to remove or warn of a natural accumulation of ice and snow. *Id.* at 221-22. The trial court granted the motion for directed verdict in part, finding that CTA had no duty to remove or warn of natural accumulations. *Id.* at 222. However, the trial court found that CTA had a "duty to provide a safe place for plaintiff to alight" and that the only issue remaining was "whether the CTA failed to provide plaintiff with a safe place to alight." *Id.*

¶ 59　The trial court subsequently instructed the jury that "in selecting a place for the plaintiff to alight from the train, it was the duty of the CTA to 'exercise the highest degree of care consistent with the mode of conveyance used and practical operation of its business as a common carrier by train.' " *Id*. at 223.[5] The jury returned a general verdict in plaintiff's favor. *Id.* at 224.

¶ 60　Upon the CTA's appeal, our appellate court reversed, concluding that CTA's motion for directed verdict should have been granted in its entirety. *Krywin v. Chicago Transit Authority*, 391 Ill. App. 3d 663 (2009). As subsequently explained by our supreme court, the appellate court reasoned "that the natural accumulation rule prevails over the CTA's duty to provide its passengers with a safe place to alight" and "rejected plaintiff's argument that the CTA could have allowed plaintiff to exit the train underneath the small canopy that covered part of the platform." *Krywin*, 238 Ill. 2d at 224 (citing 391 Ill. App. 3d 663 (2009)). The appellate court declined to impose a duty on CTA to inspect every platform every time a train arrived because it "would bring the transit system to a standstill." *Id*. (citing 391 Ill. App. 3d 663 (2009)).

---

[5] This instruction tracked Illinois Pattern Jury Instruction 100.15, which provides: "In selecting a place for the plaintiff to [board] [alight from] its vehicles, it was the duty of the defendant, as a common carrier, to exercise the highest degree of care consistent with the mode of conveyance used and the practical operations of its business as a common carrier by [bus, taxi, etc.]. The failure of the defendant to fulfill this duty is negligence." Illinois Pattern Jury Instructions, Civil, No. 100.15.

¶ 61    Following plaintiff's petition for leave to appeal, our supreme court affirmed, agreeing that the CTA's motion for directed verdict should have been granted in its entirety. However—contrary to Pace's suggestion—our supreme court did not hold that natural accumulation rule disposes of a common carrier's duties altogether.

¶ 62    In its analysis, our supreme court first recognized that "a common carrier has a duty to its passengers to exercise the highest degree of care, *not only to carry them safely to their destinations, but to provide them with a reasonable opportunity to leave the conveyance safely*." (Emphasis added.) *Id*. at 226. As a common carrier, "the CTA had a duty to provide plaintiff with a safe place to alight from its train." *Id.* at 227.

¶ 63    The supreme court then explained that: "Under the natural accumulation rule, a landowner or possessor of real property has no duty to remove natural accumulations, of ice, snow, or water from its property. [Citation.] This rule has been applied to common carriers." *Id*. at 227-31 (summarizing several decisions holding that common carriers had no duty to remove natural accumulations of precipitation). The supreme court concluded that the natural accumulation rule applied under *Krywin*'s facts, so that "the CTA had no duty to remove the natural accumulation of ice and snow from its platform, nor any duty to warn of the existence of such natural accumulation." *Id*. at 232.

¶ 64    Notable for purposes of this appeal, the supreme court in *Kyrwin* separately addressed the plaintiff's reliance on *Wasserman v. City of Chicago*, 190 Ill. App. 3d 1064 (1989), a case involving a CTA bus passenger who fell after she alighted a bus. In *Wasserman,* there were deep piles of snow at the place where the bus stopped. *Id*. at 1066. On appeal from summary judgment in favor of CTA, the plaintiff argued that CTA breached its duty to ensure that the bus stopped at a safe place for her to exit. *Id*. Our appellate court in *Wasserman* recognized that CTA had a duty

to provide plaintiff a "reasonable opportunity to reach a place of safety," including "a safe place to alight from the bus. [Citation.]" *Id.* at 1066-67." The appellate court reversed the grant of summary judgment, as CTA "was under a duty to ensure that plaintiff could alight from the bus safely, and the question of defendant's breach of that duty was one of fact to be resolved by the jury." *Id.*

¶ 65    Our supreme court in *Krywin* acknowledged *Wasserman* but found it distinguishable. In so doing, our supreme court remarked that the circumstances of a bus operator and train operator are different:

> "The issue [in *Wasserman*] was whether the CTA had breached its duty to provide the plaintiff with a safe place to alight. The fact that the streets had been cleared and that there were deep piles of snow suggest, if anything, that the snow piles were an unnatural accumulation. *In any event, it is obvious that a bus driver has a much better opportunity to determine the best place to let his or her passenger off the bus than does a train operator on an eight-car train whose only option is to discharge passengers on a platform.* Based on *Wasserman*, plaintiff argues that a jury is fully capable of deciding whether, under a specific set of facts, a common carrier should be held liable for failing to provide a safe place to alight ***. *We do not disagree with plaintiff that, under appropriate circumstances, the question of whether a common carrier breached its duty to provide a safe place to alight is a question of fact for the jury.* In *Wasserman*, the appellate court determined that a question

of fact existed and that summary judgment should not have been granted. Such is not the case here, however." (Emphases added.) *Krywin*, 238 Ill. 2d at 231-32.

¶ 66    After holding that CTA had no duty to remove or warn of a natural accumulation, our supreme court *Krywin* went on to reject the plaintiff's additional argument that the jury could still have found that CTA breached its duty to provide a safe place to alight, *i.e.*, that CTA "could have allowed plaintiff to leave its train at a place on the platform that was not covered in snow or ice." *Id*. at 233. Plaintiff asserted that the train operator could have let her off beneath the canopy that covered a portion of the platform, and that CTA "fail[ed] to provide evidence that it would not have been feasible to allow plaintiff to exit the train under the canopy." *Id.* In rejecting this argument, our supreme noted that it was plaintiff's burden to prove a breach of duty, but plaintiff presented no evidence that it was feasible to "discharge all passengers under the canopy or in some other manner that would have provided passengers with a safe place to alight." *Id.* at 234. Thus, plaintiff "did not prove that the CTA breached its duty to her to provide a safe place to alight." *Id.*

¶ 67    In addition, the supreme court agreed with the appellate court that "it would be impractical to place a burden on the CTA to evaluate its train platforms each time a train pulls in to determine which portion of each platform has the least accumulation of snow or ice." *Id.* Accordingly, the supreme court found that CTA was also entitled to directed verdict "on the issue of its alleged duty to provide plaintiff with a safe place to alight." *Id.* at 235.

¶ 68    **Application of *Krywin* to the Parties' Arguments Regarding Pace's Duty**

¶ 69    Having reviewed *Krywin,* we return to the question of whether Pace was entitled to a directed verdict under the instant trial record. Woods insists that, viewing all the evidence in the light most favorable to her, there was a factual dispute as to whether Pace had breached its duty to prove a

safe place to alight. Specifically, she asserts the jury should have evaluated the testimony and other evidence to resolve whether Connet could have pulled the bus closer to the curb.

¶ 70 Woods does not dispute that she slipped and fell on a natural accumulation of ice or snow. Nevertheless, she suggests that the natural accumulation rule is a "non-issue" in this appeal, because her claim does not depend upon whether Pace had a duty to remove ice or snow. Rather, she insists that the trial evidence presented an issue of fact for the jury as to whether Pace breached its duty to provide a safe place for her to alight. She points out *Krywin*'s acknowledgement that "under appropriate circumstances, the question of whether a common carrier breached its duty to provide a safe place to alight is a question of fact for the jury to decide." 238 Ill. 2d at 232. She maintains that the jury should have evaluated the evidence, including her and Connet's conflicting testimony, to decide whether that duty was breached.

¶ 71 Pace responds that directed verdict was proper because under *Krywin,* it "owed [Woods] no duty with regard to the natural accumulation of snow, slush and/or ice upon which she fell" after alighting the bus. Importantly, Pace does not merely argue that natural accumulation rule precluded any duty to remove or warn about the ice or snow at the intersection where Woods fell. Pace suggests that under *Krywin,* the natural accumulation rule also precludes any liability premised on a duty to provide Woods a safe place to alight. Pace's brief insists that it "had no duty under the natural accumulation rule to the plaintiff regarding the natural accumulation of snow, slush and/or ice upon which she fell, *including providing a safe place to alight* ***.*" (Emphasis added.)

¶ 72 In making this argument, Pace suggests that no duty should be imposed on Pace bus drivers as a matter of "public policy" to avoid "grind[ing] the transit system to a halt." Pace suggests that we should be guided by the logic of the appellate court decision in *Krywin*, insofar as it declined to impose a duty on CTA train operators to inspect platforms for snow or ice to avoid bringing the

transit system "to a standstill." *Krywin*, 391 Ill. App. 3d 663, 670-71. Pace suggests that if we do not rule in its favor, it will be "forced to hold passengers on buses while bus operators closely examine snow, slush or ice to determine the theoretical safest location for passengers to alight a bus."

¶ 73    The parties thus fundamentally disagree on the scope of the natural accumulation rule. Woods suggests that it merely extinguishes a duty to remove or warn of natural accumulation, but Pace maintains it also insulates a common carrier from a claim based on failure to provide a safe place to alight.

¶ 74    Our review of the supreme court's analysis in *Krywin* does not support Pace's broad view of the natural accumulation rule. Simply put, the supreme court did *not* hold that the natural accumulation rule precludes liability for failure to provide a safe place to alight. To the contrary, *Krywin* reaffirmed that a common carrier has a duty to provide passengers "with a reasonable opportunity to leave the conveyance safely," stating unequivocally that "the CTA had a duty to provide plaintiff with a safe place to alight from its train." 238 Ill. 2d at 226-27. That is, although the natural accumulation rule precluded liability for failing to *remove or warn of* snow or ice, our supreme court did not suggest that the natural accumulation rule relieves a common carrier from its duty to provide a safe place to alight. See *id.* at 232. (concluding that "CTA had no duty to remove the natural accumulation of ice and snow from its platform, nor any duty to warn of the existence of such natural accumulation.") (Emphases added.) *Id.*

¶ 75    We recognize that *Krywin* rejected the plaintiff's argument that, despite the natural accumulation rule, the jury verdict in her favor should stand because the CTA breached its duty to provide plaintiff with a safe place to alight, *i.e.*, that it could have let her off under the canopy. *Id.* at 233. While the supreme court disagreed with plaintiff, it did not suggest that CTA no longer owed

plaintiff a duty to provide a safe place to alight. Rather, it found that plaintiff did not meet her burden to present evidence that CTA breached this duty. *Id.* at 234 (plaintiff "presented no evidence that it was feasible or even possible to discharge all passengers under the canopy or in some other manner that would have provided passengers with a safe place to alight."). Our supreme court thus indicated that plaintiff could have, but did not, adduce evidence to hold CTA liable for failing to provide a safe place to alight.

¶ 76 Elsewhere, in distinguishing *Wasserman*, the supreme court in *Krywin* recognized a common carrier's duty to provide a safe place for a passenger to depart. *Id.* at 231-23 (discussing *Wasserman,* 190 Ill. App. 3d 1064). *Krywin* recognized that "under appropriate circumstances the question of whether a common carrier breached its duty to provide a safe place to alight is a question of fact for the jury to decide." *Id.* at 232. Of particular relevance to the instant case, *Krywin* remarked that "a bus driver has a much better opportunity to determine the best place to let his or her passengers off the bus than does a train operator on an eight-car train whose only option is to discharge passengers on a platform." *Id.*

¶ 77 Accordingly, we reject Pace's suggestion that it "had no duty to the plaintiff with respect to the natural accumulation of snow, slush and/or ice upon which she fell, including providing a safe place to alight despite the natural accumulation." Pace was under no obligation to remove or warn of the natural accumulation of ice or snow. However, the natural accumulation rule did not relieve Pace of its continuing duty to provide a safe place for plaintiff to alight.

¶ 78 Although we have concluded that Pace still owed a duty to provide a safe place to alight, that does not end our analysis. We must assess whether, given the evidence at trial, Pace was entitled to a directed verdict under the governing standard.

¶ 79    **Viewing the Evidence in the Light Most Favorable to Woods, a Question of Fact Precluded**

**Entry of Directed Verdict**

¶ 80    We reiterate that a directed verdict should be "entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We must construe all of the evidence "in the light most favorable to the nonmoving party", Woods. *Krywin*, 238 Ill. 2d at 225. We also keep in mind that "a reviewing court must not substitute its judgment for the jury's nor may a reviewing court reweigh the evidence or determine credibility of the witnesses." *Mansmith v. Hameeduddin*, 369 Ill. App. 3d 417, 425-26 (2006). That is, a directed verdict "should not be granted where the evidence demonstrates a substantial factual dispute or where the witnesses' credibility is at issue." *Id.*

¶ 81    Upon reviewing the trial record in this case, we cannot say that the evidence was overwhelmingly in Pace's favor so as to entitle it to a directed verdict. Rather, construing the evidence in the light most favorable to Woods, there was a substantial factual dispute—whether Pace breached its duty to provide Woods with a safe place to alight when the bus let her off in the street. This issue was one for the jury to resolve. See *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006) ("whether a defendant breached the duty and whether the breach was the proximate cause of the plaintiff's injuries are factual matters for the jury to decide, provided there is a genuine issue of material fact regarding those issues. [Citation.]").

¶ 82    We recognize that many of the underlying facts were not disputed. However, the evidence presented a fact question as to whether Connet's positioning of the bus satisfied Pace's duty to provide a safe place to alight. There was conflicting testimony on this topic. Woods testified to her

belief that nothing prevented the bus from pulling closer to the curb. Connet testified that he elected not to pull the bus over to the curb because he was trained by Pace that positioning the bus on an angle was potentially dangerous. In granting Pace's motion for a directed verdict, the trial court explicitly found Connet's testimony credible. However, it is not the role of the trial court (or this reviewing court) to assess a witness's credibility or resolve conflicting testimony.

¶ 83 We cannot say whether the jury believed Woods that nothing precluded the bus from pulling over to the curb. Nor can we assume that the jury would have accepted Connet's explanation that Pace trained drivers not to pull over to the curb in this type of situation. Further, we note that it was the jury's role to assess the trial exhibits containing images from the scene of the incident and decide whether they supported Woods' claim that the bus could have let her off at a safer place.

¶ 84 Keeping in mind that we must construe the evidence in the light most favorable to Woods, we find that Pace's motion for directed verdict should not have been granted. There was an issue of fact as to whether Pace fulfilled its duty to Woods to let her off at a safe place, and we cannot say that "all of the evidence so overwhelmingly favor[ed]" Pace that "no contrary verdict based on that evidence could ever stand." *Krwyin*, 238 Ill. 2d at 225. It was for the jury, not the trial court, to weigh the evidence and assess credibility in deciding whether Pace breached its duty to Woods.

¶ 85 Before concluding, we note Pace's concern that our failure to affirm the directed verdict will force bus drivers to "to hold passengers on buses while bus operators closely examine snow, slush or ice to determine the theoretical safest location for passengers to alight a bus." To be clear, our ruling does not purport to impose any new specific duty, beyond the general duty of any common carrier to provide a "reasonable opportunity to leave the conveyance safely." *Krywin,* 238 Ill. 2d at 227. Indeed, Woods has never suggested that a bus driver is obligated to leave the bus to "closely inspect" an area before stopping to let passengers depart. Her argument is simply that Connet

should have pulled closer to the curb to fulfill Pace's duty to provide a safe place to alight. It is for the jury to decide whether Pace breached that duty under the particular circumstances of this case. Accordingly, we reverse and remand.

¶ 86     **Video Footage of Woods' Slip and Fall Was Admissible Based on Her Testimony**

¶ 87     Because we reverse and remand based on the court's decision to grant a directed verdict, we need not reach all of the parties' separate contentions regarding the trial court's decision not to admit video footage of the incident. Nonetheless, to help clarify the issue upon remand, we note our agreement with Woods that her testimony was sufficient to authenticate and admit the video footage of her slip and fall.

¶ 88     Our supreme court has held that "videotape may be admitted as demonstrative evidence when it is properly authenticated and is relevant to a particular issue in the case." *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 283 (2003). "First a foundation must be laid, by someone having personal knowledge of the filmed object, that the film is an accurate portrayal of what it purports to show. [Citation.]" *Id*. Such verification "may be furnished by the testimony of any competent witness who has sufficient knowledge to testify that the videotape fully represents what it purports to portray." (Internal quotation marks omitted). *Id*. at 284. There can be no question that Woods was competent to testify as to the accuracy of the video footage showing her slipping and falling.

¶ 89     Nonetheless, Pace suggests that there was inadequate foundation for the video footage, based on the "silent witness" theory discussed by our supreme court in *People v. Taylor,* 2011 IL 110067. We disagree, insofar as Woods' firsthand knowledge of the video footage rendered the "silent witness" theory unnecessary. That is, nothing in *Taylor* precluded its admission.

¶ 90     *Taylor* explained that photographic evidence was historically used as demonstrative evidence but recognized that photographs and video footage can be used as substantive evidence if a proper

foundation is laid. *Id.* ¶ 32. Our supreme court proceeded to explained that such evidence is usually admitted under the "silent witness" theory, under which "a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation." *Id. Taylor* recognized that our supreme court had not yet addressed the "foundational requirements for establishing the accuracy of a process that produces surveillance camera recordings." *Id.* ¶ 33. Our supreme court noted that other jurisdictions considered various factors to determine whether adequate foundation was laid, such as evidence of the reliability and accuracy of the recording equipment, the competency of the equipment's operator, and the manner in which the recording was preserved. *Id.* (discussing multi-factor tests applied by other courts). Our supreme court recognized that although numerous factors may be relevant, admission under the "silent witness" theory is a fact-specific inquiry: "Each case must be evaluated on its own and depending on the facts of the case, some of the factors may not be relevant or additional factors may need to be considered. The dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Id.* ¶ 35.

¶ 91 Pace cites *Taylor* to suggest that admission of the footage of her slip and fall depended on the "silent witness" theory, such that Woods needed to elicit additional testimony regarding the operation and reliability of the video equipment and preservation of the footage. Pace is mistaken, insofar as the silent witness theory need be employed only if there is no witness to testify to the accuracy of the video footage. See *id.* ¶ 32 ("Under this theory, a witness need not testify to the accuracy of the *** videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation."). That is, the "silent witness" theory does not undermine the principle that "[a] proper foundation may be laid 'by someone having personal knowledge of the filmed object' " who can testify that the footage is accurate. See *In re D.Q.,* 2016

IL App (1st) 160680, ¶ 25 (quoting *Cryns*, 203 Ill. 2d at 283-84). Indeed, our court has recognized that the "silent witness" theory is simply an additional basis on which video footage may be admitted, if there is no testimony by someone with personal knowledge of the subject. See *id*.

¶ 92 The trial transcript in this case reflects that, immediately before Pace's objection, Woods testified that she had viewed video footage that accurately depicted her slip and fall. Woods' verification of the accuracy of that footage was sufficient for its admission. If Woods provides similar testimony on remand, that will be sufficient for the jury to view the footage of her slip and fall.[6]

¶ 93 CONCLUSION

¶ 94 For the foregoing reasons, we reverse the judgment of the circuit court and remand for new trial proceedings consistent with this order.

¶ 95 Reversed and remanded.

---

[6] We note that this conclusion is limited to the video footage showing Woods at the time of the incident, of which she obviously had personal knowledge. The record on appeal indicates there may have been additional video footage taken from other vantage points on the bus that did not show Woods (for example, footage showing the parked car). In any event, Woods' argument in this appeal is limited to the footage showing her actual fall.