NOTICE

Decision filed 12/06/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220463-U

NO. 5-22-0463

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| STEPHEN HARRIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 18-L-704 |
| | ) | |
| GERMANTOWN SEAMLESS GUTTERING, INC., | ) | Honorable |
| | ) | Heinz M. Rudolf, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Moore and McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*: The jury verdict finding plaintiff was contributorily negligent is affirmed where sufficient evidence was presented to allow the jury to determine the issue and the trial court's denials of plaintiff's motion for directed verdict and motion to bar the testimony of defendant's expert and granting of defendant's motion *in limine* precluding plaintiff from presenting evidence regarding his left eye, were not erroneous.

¶ 2   Plaintiff, Stephen Harris, appeals the jury verdict finding him contributorily negligent. He also appeals the trial court's denials of his motion for directed verdict and motion to bar the testimony of defendant Germantown Seamless Guttering, Inc.'s (GSG) expert, as well as the trial court's granting of GSG's motion *in limine* precluding Mr. Harris from presenting testimony related to his left eye. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      On March 15, 2018, Mr. Harris was employed by his company API, Inc., and was working as the general contractor for a home construction project located at 7000 Funk School Road, Freeburg, Illinois. Mr. Harris was also the owner of the home being built. On that day, GSG was installing guttering on the roof of the house. Mr. Harris arrived at the property late in the morning and saw the GSG vehicles parked at the property and a few GSG employees on the garage roof. Mr. Harris proceeded into the house to talk to his workers. When Mr. Harris could not find his workers, he walked out of the kitchen onto the porch and turned right to walk along the deck traversing the back of the house. As he turned the corner, a GSG employee said, "Oh shit." Mr. Harris looked up and was hit in his right eye by a tube of gutter sealant that rolled off the roof's edge.

¶ 5      On November 7, 2018, plaintiff filed a complaint against GSG. The complaint alleged GSG was negligent by (1) failing to keep proper control of the tube of caulk, (2) failing to secure the tube of caulk to prevent it from falling, and (3) failing to properly warn those nearby that an object was falling from the roof. The complaint further alleged that as a result of defendant's negligence, Mr. Harris's right eye was injured and requested damages related to the accident.

¶ 6      On December 7, 2018, GSG filed its answer admitting the accident but denying negligence and proximate cause. The answer further raised affirmative defenses of contributory negligence claiming Mr. Harris failed to wear appropriate safety glasses and failed to take reasonable precautions to protect himself from injury. On December 17, 2018, Mr. Harris filed a reply to GSG's affirmative defenses denying the allegations therein.

¶ 7      On August 13, 2020, Mr. Harris filed a motion for leave to file an amended complaint. The motion was granted, and the first amended complaint was filed on August 14, 2020. The amended

complaint included the name of the employee, Clinton Kohnen, who dropped the tube of sealant and uttered the profanity. The complaint included the three previously alleged claims of negligence and added a fourth that stated GSG "[f]ailed to barricade or cordon off the area below the workers on the roof to protect others from items which may fall off the roof when he knew or should have known that items could and had fallen from roofs before." GSG filed an answer on September 10, 2020. The answer admitted all the allegations except those related to negligence and proximate cause and raised the same affirmative defenses as seen in the previous answer. On September 16, 2020, Mr. Harris filed a reply to GSG's affirmative defenses denying the allegations therein.

¶ 8    The case was set for jury trial on February 1, 2021. On January 14, 2021, Mr. Harris moved to continue the trial due to his need for additional medical treatment. The motion was granted, and the trial was rescheduled for July 22, 2021. On February 22, 2021, GSG obtained new counsel. On May 5, 2021, GSG moved for a continuance due to the unavailability of GSG's owner at trial. Over plaintiff's objection, the motion was granted. The jury trial was set for November 15, 2021.

¶ 9    On November 4, 2021, GSG filed a motion *in limine* to bar evidence or testimony regarding Mr. Harris's left eye. In support, GSG argued that neither Mr. Harris's initial, nor the first amended, complaint claimed injury to Mr. Harris's left eye, no medical professional testified that Mr. Harris's left eye condition was related to the original accident, no Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018) disclosure regarding the left eye was made, and one of Mr. Harris's physicians stated the two eye conditions were not related.

¶ 10   On November 4, 2021, Mr. Harris filed a motion for sanctions pursuant to Illinois Supreme Court Rule 219 (eff. July 1, 2002) requesting the court bar the testimony of GSG witnesses Christopher Janson and Dr. David Hillman based on GSG's failure to provide information regarding the experts in its responses to Mr. Harris's interrogatories. The motion alleged that Mr.

3

Harris's interrogatories were provided on February 15, 2019, and GSG's response was provided on April 1, 2019. Supplemental disclosures filed by GSG on January 8, 2020 (Janson) and August 10, 2021 (Hillman) did not include the requested information. On November 5, 2021, GSG filed supplemental disclosures related to the interrogatory.

¶ 11    On November 8, 2021, GSG filed a motion for leave to file an amended answer. The proposed amended answer admitted all the allegations in Mr. Harris's first amended complaint, including negligence and proximate cause. The answer also included affirmative defenses of contributory negligence, stating Mr. Harris (1) failed to take reasonable precautions to protect himself from injury, (2) failed to barricade or cordon off the area underneath where GSG was working, and (3) walked under an area where he knew or should have known GSG was working.

¶ 12    On November 8, 2021, Mr. Harris responded to GSG's motion *in limine* related to his left eye stating he was only required to have "some evidence" to be entitled to an instruction on a damage claim, sufficient discovery was provided on the issue, and GSG should be sanctioned for the waste of Mr. Harris's time in reiterating what was included in his discovery responses.

¶ 13    On November 9, 2021, Mr. Harris filed an objection to GSG's amended answer. The same day, GSG filed a response to Mr. Harris's motion for sanctions related to the lack of responses to the interrogatories that also included objections to the requested information.

¶ 14    On November 29, 2021, the circuit court issued three orders. The first order granted GSG's motion *in limine* and excluded all evidence related to Mr. Harris's left eye. The second order denied Mr. Harris's motion for sanctions and sustained GSG's objection to interrogatory number 13. The third order granted GSG's motion to file an amended answer.

¶ 15    On January 3, 2022, Mr. Harris filed a second amended complaint. The allegations of negligence remained the same as those set forth in the first amended complaint and the only injury

4

listed as arising from the alleged negligence was Mr. Harris's right eye. On February 2, 2022, defendant filed an answer admitting all the allegations in the second amended complaint. Affirmative defenses of contributory negligence were again raised, alleging Mr. Harris (1) failed to take reasonable precaution to protect himself from injury, (2) failed to barricade or cordon the area where he was working, and (3) walked under an area where he knew or should have known defendant was working.

¶ 16    On February 10, 2022, Mr. Harris moved to strike the affirmative defenses. He also filed a response denying the allegations in the affirmative defenses.

¶ 17    On March 29, 2022, Mr. Harris filed a motion to dismiss the affirmative defenses or, in the alternative, judgment on the pleadings pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2022)). The pleading further moved to bar the testimony of defendant's expert, Christopher Janson, claiming the expert's testimony supported GSG's affirmative defenses and that GSG was attempting to engraft the responsibilities of a general contractor onto Mr. Harris. In support, the motion alleged that the general contractor on the construction project was API, Inc., a party not named in the lawsuit. Mr. Harris also relied, *inter alia*, on Restatement (Second) of Torts § 414 (1965) and *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 47. Mr. Harris contended that nothing in GSG's affirmative defenses indicated any degree of control by the general contractor.

¶ 18    On March 30, 2022, GSG filed a response to Mr. Harris's motion to dismiss, citing Mr. Harris's deposition testimony that he was on the jobsite as the contractor and hired GSG to perform the guttering work. The response also argued that the affirmative defenses included application to Mr. Harris as the general contractor and as an individual at a construction site.

¶ 19    On March 31, 2022, the final pretrial hearing was held at which time argument was presented on Mr. Harris's motion to dismiss GSG's affirmative defenses. Following the argument, the court denied Mr. Harris's motion.

¶ 20    On April 8, 2022, Mr. Harris filed a second motion to bar the testimony of Christopher Janson, once again relying on Restatement (Second) of Torts § 414 and *Carney* to allege that GSG was attempting to engraft general contractor duties onto Mr. Harris. The motion further argued against Janson's expected testimony regarding the Occupational Safety and Health Administration's (OSHA) multi-employer citation policy.

¶ 21    The case proceeded to trial on April 11, 2022. Following jury selection, Mr. Harris's opening statement addressed the accident, the OSHA regulation requirements regarding barricades for keeping materials on the roof or keeping people from walking under the roof, Mr. Harris's injury, and subsequent treatment. GSG's opening argument addressed their responsibility for the accident but further argued that the evidence would show Mr. Harris was also negligent addressing the general contractor's responsibilities as well as general rules when walking around an active construction site. Following argument and release of the jury for the day, Mr. Harris's counsel made an offer of proof regarding Mr. Harris's left eye injury, stating Mr. Harris later jumped off the back of a truck, fell on his face, immediately had similar vision problems as those caused by being hit with the sealant tube, and the fall was due to Mr. Harris's depth perception difficulties. The court stated it had not changed its mind and further noted that no motion for reconsideration was filed on the issue.

¶ 22    The following day, Mr. Harris began presenting his case in chief and called Clinton Kohnen as an adverse witness. Mr. Kohnen testified that he was working at Mr. Harris's home on March 15, 2018, was the crew chief responsible for the GSG employee's safety, and lost control of the

6

tube of sealant that hit Mr. Harris. He stated the area was not blocked off because typically that was not done on residential construction sites. He stated that Dominic Krieger was on the garage roof, used an eight-foot stepladder to access that roof, and that ladder was in the area where Mr. Harris walked on that side of the house. He stated there were also other ladders up to the top roof in the front of the house. Mr. Kohnen stated that people who work on construction sites received training in walking beneath areas where people were working. He agreed that his job title as crew chief involved safety for the GSG crew. He stated it was the responsibility of each crew at the location to take care of their own safety.

¶ 23    Dominic Krieger testified that he was working below Mr. Kohnen. He stated that he used an eight-foot ladder to get up to the garage roof and indicated where the ladder was on the day of the accident using pictures. He stated that Mr. Harris hired GSG to perform the work.

¶ 24    Nathan Rakers testified that he was at the construction site on the day of the accident. He stated that he had traffic cones in his work vehicle, but they were only used on the side of a road to keep traffic away from the workers. He stated that they usually did not tape off residential construction sites. They would occasionally tape off commercial sites because there were more people around. He expected construction workers to have a higher knowledge of safety than the general public.

¶ 25    Mr. Harris testified that he moved into the house where the accident occurred on June 30, 2018. On the day of the accident, the house was still under construction. He arrived late in the morning, went into the garage to enter the house, and walked through the house. He did not see the guys he was looking for, so he walked out the kitchen door onto the deck. He proceeded to walk around the corner and was hit by the tube of gutter sealant. He stated that he did not see any ladders as he moved through the house, except for a ladder on the front of the house. Mr. Harris

7

saw some guys on the garage roof before the accident but did not see anyone on the top roof. He did not see any stepladder and disputed that an eight-foot ladder would fit on the deck since the area was a "nine-foot cave." After the accident, Mr. Harris left the site, went to the store to purchase stain, and later went to the hospital. He had vision difficulties by Sunday, went to the ophthalmologist on Monday, and had surgery on Tuesday. He testified that it was a difficult recovery and later required two additional surgeries. He further testified to difficulties with his business due to the accident, the effect on his income, and medical expenses related to his injury.

¶ 26   On cross-examination, Mr. Harris agreed that he started his own construction business in 1997 and had 25 years of construction experience. He stated that part of his work involved general contracting. He agreed that as a general contractor, he would oversee the construction site and had certain authority. He further agreed that he was at the house on March 15, 2018, as both the general contractor and as the owner of the property. Mr. Harris testified that he hired GSG to put gutters on the house and agreed that if he saw them doing something incorrectly, he could tell them they were not doing it correctly. He agreed that he had the authority, if he saw a subcontractor doing something unsafe, to tell them to fix it. He would perform periodic inspections of the job site as the general contractor. Mr. Harris knew GSG was hired to install the gutters, the heights of the roofs, and where the gutters would be installed. He also admitted seeing the GSG trucks at his property when he arrived. He admitted knowing GSG was at the property and that GSG was working on the garage roof. Mr. Harris testified that he never checked to see if any workers were on the other roof. He admitted the accident occurred directly underneath the roof line of his house, which was directly underneath an area where GSG was installing gutters. Mr. Harris testified that, prior to the incident, he never asked GSG or any of his own employees to tape off any areas around

8

the perimeter of the house. He further testified that he did not tell either group to tape off the area after he was hit by the tube of sealant.

¶ 27 The video deposition of Dr. Blonnie Dudley was played for the jury. Dr. Dudley, who was an ophthalmologist, testified that he was the physician who performed Mr. Harris's surgery on March 20, 2018. Dr. Dudley stated that Mr. Harris did well after surgery but later developed a cataract. He referred Mr. Harris to a different physician for care of the cataract.

¶ 28 The video deposition of Dr. Daniel Walsh was played for the jury. He testified that he was an optometrist and provided professional services related to Mr. Harris's corneal erosion that arose from Mr. Harris's dry eye condition.

¶ 29 Miranda Pogue testified that she worked as a nurse practitioner in the St. Elizabeth Hospital emergency room on the day of the accident. She testified about Mr. Harris's complaints upon arrival and the treatment rendered at the facility.

¶ 30 Two video depositions of Dr. Michael Jones were played for the jury. Dr. Jones testified that he was Mr. Harris's ophthalmologist and addressed the treatments provided to Mr. Harris. Following his testimony, the jury was released for the day.

¶ 31 The following day, plaintiff's expert witness regarding construction and civil engineering litigation, Gregory Pestine, provided testimony. He addressed OSHA, testified about what the agency did, and explained that their safety regulations no longer differentiated between commercial and residential building. Mr. Pestine testified that he was applying the OSHA construction regulations, specifically section 502(j) which addressed materials that were grouped or stacked near a roof edge, section 501(c)(3) which addressed barriers to keep materials from hurting someone if the materials fell, and section 1926.102(a) which required eye protection in certain situations. He testified that Mr. Harris wore his safety glasses and opined that GSG violated

sections 501(c)(3) and 502(j) of the OSHA regulations. He stated that the general contractor had overall site supervisory authority, but the subcontractor would likely have a greater knowledge about the work it was required to perform. In this case, he opined that GSG had superior knowledge on performing gutter work and performing the work safely. He stated that the general contractor was supposed to provide a competent person to perform periodic inspections. That person would be capable of identifying existing or predictable hazards to health and safety in the workplace and have authority to correct those situations. Mr. Pestine testified that in this instance, there was no existing identifiable hazard. If Mr. Harris was the competent person there was no way he could have known there was a man caulking the edge of the guttering. He did not think OSHA would have held Mr. Harris responsible. He indicated that the fact that there was a ladder and nobody was on it told him nothing, stating, "If I saw an eight-foot ladder, I wouldn't think there was somebody up on a nine-foot roof above it." Mr. Pestine explained that OSHA directive CPL 2-0.124 was the multi-employer citation policy that included the controlling employer, the correcting employer, the creating employer, and the exposing employer. Mr. Pestine stated it did not provide any duties for an employer and only gave OSHA agents more leeway as to whom they cited. Based on his experience, GSG violated the standards and requirements of OSHA, and the violations were the proximate cause of Mr. Harris's injury. He stated the words "Oh shit" were not an appropriate warning.

¶ 32    On cross-examination, Mr. Pestine stated that Mr. Harris did not have a responsibility to put up a barricade if he was aware of work being done on the roof and saw no barricade installed by GSG, unless Mr. Harris was aware of where the work was taking place. He stated the entire perimeter of the house would not be barricaded if you did not know where anyone was. He agreed that if Mr. Harris was aware that Mr. Kohnen was on the corner of the roof doing work on the roof,

10

and he was also aware there was no barricade underneath the area, then Mr. Harris would have a responsibility to address that or tell GSG to barricade the area. He further agreed that if Mr. Harris was aware that there was work being done on the roof then it would have been his responsibility to stay out of the way. The expert did not know if Mr. Harris knew who was at the site. He stated that although Mr. Harris may have seen a truck, he was not sure Mr. Harris knew what they were doing or where. He did not know if Mr. Harris was aware that there were people working on the roof when he arrived that day. He agreed that if Mr. Harris was aware of an unsafe condition on his construction site, "he would have the duty to address it." He further agreed that if Mr. Harris knew they were on the roof and working in the location where they were working at the time of the accident, when he walked outside, he would know there was no barricade under that area.

¶ 33　On redirect, Mr. Pestine was advised that Mr. Harris had just arrived at the site, saw the guttering truck, and saw some people working on the roof of the garage but no one else. Mr. Pestine stated those facts did change his opinion. He stated that if Mr. Harris knew GSG was working on the garage he had no reason to think they were working somewhere else as well. He stated Mr. Harris would be even less inclined to barricade off that one corner knowing that workers were somewhere else. Mr. Pestine opined that he did not think that Mr. Harris was negligent because "he had no knowledge of this work going on above, so he couldn't be held responsible for protecting himself from the hazard it caused." Following Mr. Pestine's testimony, the plaintiff rested.

¶ 34　GSG presented its case in chief by playing Brent Kohrmann's video deposition for the jury. On the day of Mr. Harris's accident, Mr. Kohrmann, who is the son of GSG's owner, was hanging downspouts and doing gutter work. He did not see the accident, speak to Mr. Harris, or hear anything other than Mr. Kohnen's exclamation when the tube rolled away. He stated that the next

11

day everyone was told to be careful of their surroundings but there was no mention of how sealant tubes should be handled. On cross-examination, Mr. Kohrmann stated that as to safety, he was told if he ever heard anyone shout for any reason, to just look down so it would hit the back of his head instead of his face. This information was provided to him by Mr. Kohnen who was the senior employee on the job. Mr. Kohrmann stated that barricades were the responsibility of the contractor, and this general contractor did not tell them to erect one. On redirect, Mr. Kohrmann stated that every new guy was trained by the most senior employee. He believed that Mr. Kohnen's statement when the sealant rolled away was an appropriate warning because it gave notice that something was about to happen. When asked what made him think that statement would tell him something was coming down, Mr. Kohrmann replied, "When you're on a job site and you see ladders on a roof—moving up to a roof and you see a guttering truck with guttering trailer *** you always have to be conscious someone is working on that roof." He believed there were two ladders on the deck side of the house and there were "ladders all around that house."

¶ 35    GSG's expert, Christopher Janson, a board-certified safety professional, stated that part of his job involved accident prevention programs. In those circumstances, he would inspect the sites, look for hazardous conditions, and write a report to inform the business of what needed to be done to prevent accidents and injuries. The other part of his job was helping businesses stay in compliance with OSHA to avoid fines. Mr. Janson testified that general contractors were responsible for safety on the job site and both the general contractor and the subcontractors were responsible for complying with OSHA regulations. He stated that the general contractor was typically responsible for performing onsite inspections. Mr. Janson opined that there should have been warnings or barricades where GSG was working. Mr. Janson stated,

12

"On a construction site the general contractor is also ultimately responsible for the whole site. He controls the work. So[,] if you look at this as relates to OHSA *** the general contractor's also responsible for making sure that the subs follow safety rules and do what they're supposed to do."

Mr. Janson opined that Mr. Harris violated principles related to OSHA because he controlled the job site, had the duty to ensure subcontractors fulfilled their duties under OSHA, and was to ensure the site was safe. Mr. Janson was also asked about the OSHA multi-employer citation policy. Following an objection that was overruled because plaintiff's expert spoke about the policy, Mr. Janson testified about the four categories of employers and what each one did. He stated that the general contractor would be the controlling employer because they controlled the job site. He stated that Mr. Harris would have been in violation of OSHA policy because he should have ensured that the subcontractor was performing their duties by barricading off an area where work was being performed overhead.

¶ 36     On cross-examination, Mr. Janson stated that Mr. Harris would still have violated OSHA policy even if he could not see anyone on the roof and the people on the roof could not see anyone on the walkway. He explained that safety was anticipatory, not reactionary, and guttering work was always above roof level. He explained that the OSHA multi-employer policy was not a regulation; it was an explanation of how OSHA and safety professionals applied the standards contained in the regulation and how OSHA viewed the duty. He stated that OSHA viewed everyone as being responsible including the subcontractor and the general contractor. He agreed that based on where Mr. Harris was standing when he was hit, he would not be able to see Mr. Kohnen on the roof or the tube of sealant. Following Janson's testimony, the defense rested.

¶ 37 Thereafter, Mr. Harris moved for a directed verdict based on *Carney*, the Restatement (Second) of Torts § 414, and jury instruction 55.01. Mr. Harris argued that there was no testimony of control. GSG argued there was sufficient evidence to present the issue of contributory negligence to the jury and the facts in this case were inconsistent with those in *Carney*. GSG further argued that there were other areas of contributory negligence, including a failure to be aware of his surroundings and walking underneath an area where Mr. Harris knew or should have known work was being performed. The court denied Mr. Harris's motion.

¶ 38 Following closing arguments, the trial court read the jury instructions that included the following:

> "[I]f the jury found that all four propositions were proven as to the defendant, then you must consider Defendant's claims that the plaintiff was contributorily negligent. As to these claims, defendant has the burden of proving, A, Plaintiff Stephen Harris failed or failed to act in one or more of the following ways: Failed to take reasonable precaution to protect himself from injury; or failed to barricade or cordon off the area underneath where the defendant was working; or walked under an area where he knew or should have known the defendant was working, and in so acting or failing to act was negligent, B, Plaintiff's negligence was a proximate cause of his injuries."

¶ 39 Following deliberations, the jury made a finding in favor of Mr. Harris and against GSG, in the amount of $205,677.42. However, the jury further found Mr. Harris was contributorily negligent in the amount 45% and assessed Mr. Harris recoverable damages in the amount of $92,554.84. After polling the jury, the court entered judgment on the verdict.

14

¶ 40    On May 13, 2022, Mr. Harris filed a posttrial motion moving to set aside the verdict and judgment and grant a new trial. In support, Mr. Harris argued that the court erred by allowing GSG to argue that Mr. Harris was contributorily negligent when there was no evidence or testimony to support the argument and the court erred by allowing Janson to testify after denying plaintiff's motion to bar defendant's expert. Mr. Harris requested the court set aside the verdict and enter verdict in favor of plaintiff for the full amount of the jury verdict, $205,677.42. Alternatively, Mr. Harris requested the court amend the math error which should have awarded Mr. Harris $113,122.58. On July 5, 2022, GSG filed its response disputing all of the allegations except the math error. Following a hearing on July 7, 2022, the trial court issued an order correcting the damages award and denying the remainder of Mr. Harris's motions.

¶ 41                                    II. ANALYSIS

¶ 42    On appeal, Mr. Harris argues that the jury's finding of contributory negligence was in error. He further argues that the circuit court improperly denied his motion for a directed verdict and his motion to bar Christopher Janson's testimony. Mr. Harris also argues that the circuit court improperly barred him from submitting evidence as to his left eye.

¶ 43                          A. Contributory Negligence

¶ 44    On appeal, Mr. Harris contends that he was only an employee of the general contractor and therefore was not contributorily negligent. He further argues that even if he was the general contractor, finding him liable due to his position was contrary to the decision in *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984. This was so because *Carney* reaffirmed the common law rule that "one who employs an independent contractor is not liable for harm caused by the latter's acts or omissions." *Id.* ¶ 31. Mr. Harris further argues that under section 414 of the Restatement (Second) of Torts and *Carney*, a general right to enforce safety is insufficient to find retained

15

control over the independent contractor. *Id.* ¶ 47. Therefore, Mr. Harris cannot be contributorily negligent.

¶ 45 While there is no dispute that a general right to enforce safety does not amount to retained control when addressing theories of vicarious liability as seen in both *Carney* and section 414 of the Restatement (Second) of Torts, even if applicable to contributory negligence, the legal principle only addresses one theory posited for Mr. Harris's negligence. That theory was Mr. Harris's failure to barricade or cordon off the area underneath where GSG was working. As noted above, the jury instruction provided three distinct theories that, regardless of Mr. Harris's responsibility or lack of responsibility as the general contractor, left two remaining.[1] Those two theories included Mr. Harris's failure to take reasonable precautions to protect himself from injury and Mr. Harris walking under an area where he knew or should have known GSG was working. Neither of those theories were dependent on Mr. Harris's status as the general contractor.

¶ 46 "Whether conduct was negligent or contributorily negligent is rarely decided as a matter of law." *Johnson v. Colley*, 111 Ill. 2d 468, 475 (1986). "The determination of what conduct is negligent or contributorily negligent is a composite of the experiences of average people, and is left to the jury for evaluation." *Id.* "A plaintiff is contributorily negligent when he or she acts without the degree of care that a reasonably prudent person would have used for his or her own safety under like circumstances and that action is a proximate cause of his or her injuries or death." *Merca v. Rhodes*, 2011 IL App (1st) 102234, ¶ 45. A reviewing court will not set aside a jury's verdict unless it is against the manifest weight of the evidence. *Mizowek v. De Franco*, 64 Ill. 2d 303, 310 (1976). " 'A verdict is against the manifest weight of the evidence where the opposite

_____

[1]Mr. Harris did not challenge either of the remaining two theories either before the trial court or on appeal. Therefore, any argument regarding either of those theories is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

16

conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary[,] and not based on upon any of the evidence.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992) (quoting *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 2d 1082, 1089 (1990)).

¶ 47    "It is settled law that where several causes of actions are charged and a general verdict results, the verdict will be sustained if there is one or more good causes of action or counts to support it." *Moore v. Jewel Tea Co.*, 46 Ill. 2d 288, 294 (1970). If plaintiff "desired to ascertain upon which count or counts the jury returned its verdicts, [he] could have done so by submitting a separate form of verdict as to each count." *Id.* "Not having done so, [he] cannot complain or seek to take advantage of [his] failure." *Id.*

¶ 48    "[T]he supreme court's rulings with regard to general verdicts provide that when multiple claims, theories, or defenses were presented to the jury, without the submission of special interrogatories or separate verdict forms, the return of a general verdict creates a presumption that the evidence supported at least one of the claims, theories, or defenses and will be upheld." *Great American Insurance Co. of New York v. Heneghan Wrecking & Excavating Co.*, 2015 IL App (1st) 133376, ¶ 15. Here, three distinct theories regarding Mr. Harris's contributory negligence were presented to the jury in the instructions and a general verdict was returned. No special interrogatory or separate verdict related to the theories of contributory negligence was presented. Further, no argument is presented regarding the viability of the remaining two theories of contributory negligence. As such, we cannot hold that the jury's finding of contributory negligence is against the manifest weight of the evidence.

¶ 49    Contributory negligence requires evidence revealing that the plaintiff was negligent in that he or she failed to exercise ordinary care for his or her own safety and the plaintiff's negligence was a proximate cause of his injury. *Savage v. Martin*, 256 Ill. App. 3d 272, 281 (1993). "The

obligation of exercising reasonable care is a duty which constantly attends every individual." *Lasko v. Meier*, 394 Ill. 71, 79 (1946). "Where a plaintiff is thoroughly familiar with a possible hazard involved in the performance of his job and with the means to avoid such, the fact that at a particular time he may have been momentarily unmindful thereof, forgetful thereof, or have overlooked it does not absolve him from the duty of observing due care for his own safety." *Day v. Barber-Colman Co.*, 10 Ill. App. 2d 494, 511 (1956). "It is elementary law that the degree of care which a plaintiff in a given case is bound to exercise will be found to depend upon the relative rights or position of the parties at the time that the injury complained of happened ***." *Metz v. Yellow Cab Co.*, 248 Ill. App. 609, 614 (1928).

¶ 50    Here, Mr. Harris was the owner of the building where the guttering was being installed. He testified that he (1) was the owner of a construction company, (2) had 25 years of construction experience, (3) hired GSG to put the gutters on the house, (4) saw GSG's trucks when he pulled up to the job site, (5) saw people working on the garage roof when he walked toward the house, and (6) saw a ladder extending from the ground to the second floor while he was walking through the house. These facts confirm Mr. Harris's knowledge of guttering work being performed on the roof of the house, which was undisputedly above ground level. As such, regardless of OSHA regulations, and any duties thereunder as a general contractor, when Mr. Harris walked out of the house and moved from beneath the safety of any support above his head, he had a duty to protect himself. Under these facts, we cannot find that a jury's finding of contributory negligence—which included Mr. Harris's failure to take reasonable precaution to protect himself from injury or walking under an area where he knew or should have known GSG was working—was against the manifest weight of the evidence.

18

¶ 51                                B. Directed Verdict

¶ 52    Mr. Harris also argues that the trial court's denial of his motion for directed verdict was in error. In support, Mr. Harris contends that while GSG argued that Mr. Harris should have been aware of his surroundings and knew or should have known that he was walking under an area where work was being performed, such claim would require Mr. Harris to be clairvoyant. Alternatively, Mr. Harris argues that because the trial court erred in allowing GSG's expert, Christopher Janson, to testify, GSG was allowed to present evidence that was contrary to the Illinois Supreme Court's decision in *Carney* and section 414 of the Restatement (Second) of Torts.

¶ 53    "A motion for directed verdict will not be granted unless all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010) (citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). We review the order disposing of the motion for a directed verdict *de novo*. *Id.* On review, we construe all the evidence "in the light most favorable to the nonmoving party." *Id.* (citing *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 353-54 (1992)).

¶ 54    Here, the nonmoving party is GSG. As noted above, the evidence revealed that Mr. Harris arrived at the work site after GSG, saw GSG's trucks on the property, knew GSG was at the property to perform guttering work because Mr. Harris hired them for such purpose, saw GSG employees on the garage roof, and also saw a ladder on the front of the house that extended to the higher roof. This evidence, even without the conflicting evidence related to the ladders on the back deck, is sufficient to address at least two of the three potential claims of contributory negligence alleged by GSG. Under these facts, it would be unnecessary for Mr. Harris to be clairvoyant. Given his construction experience, he knew, or should have known, that he was walking under an area

19

where work was being performed because he admitted seeing people on the garage roof and a ladder extending from the ground to the top roof of the house. As such, we cannot find the trial court's order denying the directed verdict was in error.

¶ 55                                  C. Evidentiary Issues

¶ 56    Mr. Harris also argues that the trial court erred by denying his motions to bar GSG's expert, Christopher Janson, from testifying. Mr. Harris first argues that Mr. Janson's testimony should have been barred because it was contrary to *Carney* and section 414 of the Restatement (Second) of Torts.

¶ 57    A trial court "is *** vested with the discretion to determine the relevance and admissibility of evidence, including expert testimony." *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 4 (2007). The trial court's determination of whether an expert should be allowed to provide testimony will not be disturbed absent an abuse of discretion. *Korte & Luitjohan Contractors, Inc. v. Erie Insurance Exchange*, 2022 IL App (5th) 210254, ¶ 25; *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993) (a reviewing court will not reverse a trial court's evidentiary ruling unless the trial court abused its discretion). "An abuse of discretion will be found where no reasonable person would take the view adopted by the trial court." *Dawdy v. Union Pacific R.R. Co*., 207 Ill. 2d 167, 177 (2003).

¶ 58    Both the original motion, and Mr. Harris's argument on appeal, are based on "Janson's report" and contend Mr. Janson equated "the general responsibility: 'General contractors have overall responsibility for ensuring the safety of a work site including responsibility for ensuring that subcontractors abide by all applicable safety rules' with tort liability," citing to page 445 in the record. However, Janson's report is not contained in the record on appeal, and it is not Janson's report that is cited. The citation refers to GSG's undated Rule 213 disclosure summarizing Mr.

20

Janson's opinions in conjunction with OSHA's multi-employer citation policy. Regardless, we find the argument has little merit.

¶ 59    First, at the hearing on the motion, after repeatedly arguing that the OSHA regulations were inapplicable in this case, Mr. Harris's counsel conceded that his expert was going to testify that the OSHA regulations applied. The court responded, "Well then good for the goose, good for the gander." We cannot disagree given this record. While Mr. Harris's brief claims the testimony regarding OSHA's multi-employer citation policy should have been barred based on the lack of evidence exhibiting Mr. Harris's control over GSG, Mr. Harris's own expert, Mr. Pestine, testified about OSHA's multi-employer citation policy. Mr. Pestine also testified that that if Mr. Harris was aware that Mr. Kohnen was on the corner of the roof doing work on the roof, and he was also aware there was no barricade underneath the area, then Mr. Harris would have a responsibility to address that or tell GSG to barricade the area. Mr. Pestine also testified that if Mr. Harris was aware there was work being done on the roof, then it would have been Mr. Harris's responsibility to stay out of the way. Finally, Mr. Pestine testified that if Mr. Harris was aware of an unsafe condition on his construction site, "he would have the duty to address it."

¶ 60    "It is well settled that one cannot complain of admission of evidence offered by one party where practically the same evidence is afterward introduced by the party so complaining." *Forest Preservice District v. South Holland Trust & Savings Bank*, 38 Ill. App. 3d 873, 876 (1976). Here, Mr. Harris complains about Mr. Janson's testimony; however, his own expert provided testimony on the same issues, namely OSHA regulations and the OSHA multi-employer citation policy. The only difference in the testimonies of Mr. Pestine and Mr. Janson was what each expert believed Mr. Harris knew upon his arrival at the job site and whether OSHA would have issued a citation to Mr. Harris based on his controlling employer status. Given the pretrial arguments, Mr. Pestine's

21

trial testimony, the side bar during Mr. Janson's testimony at trial, and Mr. Janson's testimony at the trial, we cannot find the trial court abused its discretion in allowing Mr. Janson to testify based on the proposed testimony set forth in GSG's Rule 213 disclosure.

¶ 61    Mr. Harris also contends that Mr. Janson's testimony should have been barred as a sanction for GSG's failure to timely provide responses to Mr. Harris's discovery request. "Rule 219(c) authorizes a trial court to impose a sanction, including dismissal of the cause of action, upon any party who unreasonably refuses to comply with any provisions of this court's discovery rules or any order entered pursuant to these rules." *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998). "The decision to impose a particular sanction under Rule 219(c) is within the discretion of the trial court and, thus, only a clear abuse of discretion justifies reversal." *Id.*

¶ 62    Here, the discovery at issue is Mr. Harris's interrogatory number 13. Mr. Harris's November 4, 2021, motion argued that GSG failed to provide responses related to (1) the witnesses' opinions, and basis therefor, and (2) the names of each and every lawsuit in which the expert was retained for consultation, including the case name, city and state of the court, name of the court, court number, name and last known address of the attorney or insurance company who hired the expert and further state in each case whether the expert testified in discovery or evidence deposition for the last five years. The motion contended that the interrogatories were provided to GSG on February 15, 2019, GSG's response was provided on April 1, 2019, and GSG's supplemental disclosure filed on January 8, 2020, also failed to include the requested information.

¶ 63    On appeal, Mr. Harris contends the decisions in *Fraser v. Jackson*, 2014 IL App (2d) 130283, ¶¶ 30-31, and *Myatt v. Cassens Transport Co.*, 2018 IL App (1st) 171694-U, ¶ 39, support his argument that sanctions should have been imposed on GSG and that sanction should have been barring the testimony of Mr. Janson. We disagree.

22

¶ 64    First, Mr. Harris's citation to *Myatt* is contrary to Illinois Supreme Court Rule 23(e) (eff. Feb. 1, 2023). No unpublished decision, issued prior to January 1, 2021, may be cited before any Illinois court. *Id.* Further, *Fraser* involved a party's disregard of a trial court's order issued after a motion to compel was filed. 2014 IL App (2d) 130283, ¶¶ 30-31. Most notable here is the lack of Mr. Harris's initiative to proceed in any manner necessary to trigger the requested sanction prior to November 2021.

¶ 65    Illinois Supreme Court Rule 201(k) requires the parties to "make reasonable attempts to resolve differences over discovery." Ill. S. Ct. R. 201(k) (eff. Mar. 17, 2023). The rule further requires that "[e]very motion with respect to discovery shall incorporate a statement that counsel" were unable to resolve the differences after reasonable attempts to do so. *Id.* "Cooperation between counsel and good-faith efforts by them to resolve disputes without judicial intervention are essential to the efficient and expeditious administration of justice in this State ***." *Spiller v. Continental Tube Co.*, 95 Ill. 2d 423, 431 (1983). Here, there is no evidence of any 201(k) correspondence from Mr. Harris to GSG or a motion to compel requesting the court issue an order requiring GSG to provide the requested information prior to Mr. Harris's request for sanctions. In fact, the record is devoid of any request for the missing information by Mr. Harris prior to requesting sanctions.

¶ 66    "Sanctions must be proportionate to the gravity of the violation." *In re Marriage of Lai*, 253 Ill. App. 3d 111, 117 (1993). Discovery sanctions are not used to punish a recalcitrant party; they are used to coerce that party to provide the requested discovery. *Brandt v. John S. Tilley Ladders Co.*, 145 Ill. App. 3d 304, 306-07 (1986). Sanctions are limited to a party's disregard of a court order. *Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 63 (1995). No sanction is warranted

23

when no reasonable attempt to resolve the issue was made prior to seeking judicial intervention and no motion to compel was ever filed. See Ill. S. Ct. R. 201(k) (eff. Mar. 17, 2023).

¶ 67 Finally, it must also be noted that GSG objected to the information requested in the interrogatory as being "irrelevant and overbroad." The trial court sustained GSG's objections and Mr. Harris did not request review of that ruling on appeal. "Points not argued are forfeited ***." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Failure to argue that the court erroneously sustained GSG's objection undermines Mr. Harris's argument that the trial court erred in denying Mr. Harris's motion for sanctions that requested Janson's testimony be barred for GSG's failure to properly respond to Mr. Harris's interrogatory. Accordingly, we hold the trial court's denial of Mr. Harris's motion for sanction was not an abuse of discretion.

¶ 68 Finally, Mr. Harris contends that the trial court's granting of GSG's motion *in limine*, barring Mr. Harris from providing testimony and evidence related to his left eye, was erroneous. We review the trial court's decision to grant or deny a motion *in limine* under the abuse of discretion standard. *Alm*, 373 Ill. App. 3d at 4. A trial court abuses its discretion only if it acts without the employment of conscientious judgment, exceeds the bounds of reason, ignores recognized principles of law, or if no reasonable person would take the position adopted by the court. *Id.*

¶ 69 Here, Mr. Harris argues that the court erred in disallowing his testimony regarding a subsequent accident that involved Mr. Harris jumping off a truck, falling on his face, and allegedly causing a detached retina in his left eye. In support, he cites numerous cases regarding expert testimony and the standard of "a reasonable degree of medical certainty" related to that testimony.

¶ 70 We note, however, that while GSG's initial motion *in limine* addressed the lack of any medical testimony to support Mr. Harris's claim, this was not the only basis for the motion. Here,

24

GSG's motion stated that all of Mr. Harris's treating physicians had been deposed and none offered any testimony relating Mr. Harris's left eye condition to the March 15, 2018, injury. The motion further alleged that Mr. Harris's retinal specialist, Dr. Akduman, specifically testified that Mr. Harris's left and right eye conditions were unrelated. Additionally, GSG's motion noted that neither Mr. Harris's initial nor his first amended complaint alleged any injury to his left eye and no Rule 213 disclosure was ever made regarding Mr. Harris's left eye. GSG's supplemental motion *in limine* was based on both a lack of medical testimony establishing the left eye injury was related to the March 2018 accident, as well as the lack of disclosure of any medical records related to right eye injury. In response, Mr. Harris, citing *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 406-07 (1998), argued that he was only required to point out " 'some evidence' in the record to be entitled to an instruction on a damage claim." The remainder of the response was identical to that set forth in his current brief.

¶ 71    The order issued by the trial court on November 29, 2021, stated that oral arguments on the motion *in limine* were presented and "the court being fully advised in the premises hereby grants the defendant's motion. The court rules all evidence[,] testimony[,] or reference to plaintiff's left eye injury or condition, including subsequent treatment related thereto, is excluded from the jury trial in this cause." No basis for the ruling was included in the order. Approximately one month later, Mr. Harris filed a second amended complaint that again contained no allegation of injury to his left eye. However, the left eye issue arose again when Mr. Harris's counsel submitted an offer of proof on the issue before the court on April 11, 2022. Following the offer of proof, the court noted there previously was a "long hearing with regard" to the issue which the court estimated was 45 minutes. At that time, each party "painstakingly went through [their] pleadings." The court noted it had not "changed its thoughts" and "no motion for reconsideration"

25

was filed. While the trial court clearly addressed the motion *in limine*, the basis for the court's ruling is not contained in the court's order or within the record supplied on appeal.

¶ 72    An appellant must provide a sufficient record for review of their claims. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id*. at 392. As noted during the offer of proof, a lengthy hearing was held on the issue. Without a transcript or an acceptable substitute therefor (see Ill. S. Ct. R. 323(c) (eff. July 1, 2017)), this court is left to guess at the basis of the trial court's decision. We decline to do so. "An issue relating to a circuit court's factual findings and basis for its legal conclusions obviously cannot be reviewed absent a report or record of the proceeding." (Internal quotation marks omitted.) *In re Marriage of Gulla*, 234 Ill. 2d 414, 422 (2009). In the absence of an adequate record, we "must presume the circuit court's order had a sufficient factual basis and that it conforms with the law." *Id.* Accordingly, we find the trial court's order granting GSG's motion *in limine* was not an abuse of discretion and affirm the November 29, 2021, order.

¶ 73                                III. CONCLUSION

¶ 74    For the foregoing reasons, we affirm the circuit court's judgment.


¶ 75    Affirmed.